**MORGAN, LEWIS & BOCKIUS LLP**
Susan Baker Manning, CA Bar No. 197350
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:   +1.202.739.3000
Fax:  +1.202.739.3001
susan.manning@morganlewis.com

Lisa R. Weddle, CA Bar No. 259050
Kent W. Kraushaar, CA Bar No. 307536
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA 90071-3132
Tel:   +1.213.612.2500
Fax:  +1.213.612.2501
lisa.weddle@morganlewis.com
kent.kraushaar@morganlewis.com

Attorneys for Plaintiffs
A.F.P and J.F.C.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| A.F.P. and J.F.C., | Case No. 21-548 |
| Plaintiffs, | |
| v. | COMPLAINT |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## INTRODUCTION

1.  This case is about the unprecedented policy issued at the highest levels of the United States government to separate asylum-seeking parents and children. The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including Plaintiffs A.F.P. and his son J.F.C.,[1] whom the United States government forcibly

---

[1] Consecutive with this Complaint, Plaintiffs will file a motion for leave to proceed under pseudonyms to protect their identities from public disclosure due to the trauma inflicted upon them. Plaintiffs have already disclosed their full names to the relevant government agencies in their administrative claims filed in accordance with 28 U.S.C. § 3401(b).

separated for fifteen months. The trauma that Plaintiffs and other parents and children suffered was not an incidental byproduct of the government's policy. It was the very point. The government *sought* to inflict extreme emotional distress and other harms in order to deter parents and children from seeking asylum in this country.

2.   The government *intended* to use the trauma resulting from family separations, and media reporting about that trauma, to deter future asylum seekers. Government officials at the highest levels repeatedly made public statements acknowledging that this was the policy's purpose. Despite widespread condemnation and a federal court injunction requiring the government to reunite separated families and stop further separations, then-President Donald Trump defended the policy as a deterrent to migration from Central America. Even months after a federal court had ordered an end to the policy, President Trump stated on Twitter that "if you don't separate, FAR more people will come." Donald J. Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 a.m.), https://twitter.com/realDonaldTrump/status/1074339834351759363.

3.   Plaintiffs' claims concern the entirely predictable—and, in fact, desired—harms caused by the United States government's unprecedented conduct in systematically separating asylum-seeking parents and children. Government employees forcibly separated A.F.P. and J.F.C. after they entered the United States in January 2018 to seek asylum from persecution in Honduras. Despite their credible claim for asylum, government employees detained Plaintiffs in separate facilities thousands of miles apart by detaining A.F.P. in Texas, Ohio, and Louisiana, while forcibly transferring J.F.C. to a detention center in New York.

4.   While his father was forced into court without representation of any kind, government officers whisked J.F.C. away and flew him to New York. Upon landing, they crammed J.F.C. into a small home with fifteen other boys and forced him to live in squalid conditions. After J.F.C.'s removal to New York, government officers disallowed A.F.P. from contacting his son for nearly a month. It was only after A.F.P. went on a hunger strike that government officials finally allowed him to talk to his son on the phone for a few minutes. Over the course of more than a year of separation, officials only permitted A.F.P. and J.F.C. to talk to each other on the phone twice.

5. In addition to separating A.F.P. from his son, government officials used deceit, trickery, and severe physical and emotional abuse to force A.F.P. to abandon his plainly credible asylum claim, imprisoned him in a series of maximum-security prisons and eventually deported him. Making matters worse, upon his deportation from the United States, A.F.P. not only feared for his own life, but also feared that he would never see his son again.

6. In addition to the harm of being separated from his father, J.F.C. suffered severe emotional and physical abuse while he was detained in New York. Adult caregivers repeatedly screamed at J.F.C. and verbally attacked him for merely seeking to use the bathroom and reporting a problem with another boy. These incidents emotionally scarred J.F.C. and discouraged him from reporting further problems. J.F.C. also suffered physical injury as a direct result of the government's neglect. After suffering an injury to his ear during a trip to an indoor swimming pool, J.F.C. complained to the detention center staff about his pain. Rather than provide him with medical care, the detention center staff ignored his complaints. J.F.C. developed a serious ear infection which has left him with hearing loss in his left ear.

7. Plaintiffs were finally reunited in March 2019—after well over a year of separation—only due to the intervention of a human rights organization that helped arrange A.F.P.'s re-entry into the United States to seek asylum for a second time.

8. A.F.P. and J.F.C. suffered significant physical and emotional harm as a direct result of Defendant's unlawful conduct and violation of Plaintiffs' constitutional and statutory rights.

9. Defendant is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671 et seq. (FTCA).

10. Plaintiffs bring this action under the FTCA seeking compensation for the extraordinary harms they suffered at the hands of the United States government.

## JURISDICTION & VENUE

11. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question), 1346(b) (United States as defendant).

12. On January 24, 2020, Plaintiffs submitted a Notification of Incident and Claim for Damages Under the Federal Tort Claims Act to each agency Defendant. Each Plaintiff also completed Standard Form 95 and provided a detailed description of the basis of his claim.

13. Defendant has not responded, much less made a final disposition of Plaintiffs' administrative claims.

14. Because Defendant failed to make a final disposition of Plaintiffs' claims within six months, Plaintiffs' claims are deemed finally denied. *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

15. Venue is proper in the Eastern District of California under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

## THE PARTIES

16. Plaintiff A.F.P. is a citizen of Honduras. Fearing persecution, torture, and death, A.F.P. fled Honduras with his son, J.F.C., and sought refuge in the United States.

17. Plaintiff J.F.C. is a citizen of Honduras. With his father, J.F.C. fled persecution, torture, and death in his home country and sought refuge in the United States. J.F.C. was fifteen years old at the time of the forced separation described in this Complaint, and was a minor at all times that Defendant's employees detained him.

18. A.F.P. and J.F.C. are presently seeking asylum in the United States. The family currently resides in the Eastern District of California.

19. The United States of America has waived sovereign immunity as to claims under the FTCA and is properly named as a defendant to each of Plaintiffs' claims under the Act. 28 U.S.C. § 2679(a).

## FACTUAL BACKGROUND

**A. Plaintiffs Sought Asylum in the United States Because They Face Persecution, Torture, and Death in Honduras.**

20. In November 2017, A.F.P. volunteered at his local general election polling place in Honduras. When counting the votes at the end of the day, a group of police officers and civilians provided A.F.P. with a stack of pre-filled ballots and demanded that he count these ballots for the

National Party. Unwilling to go against his strong moral code, A.F.P. refused to accept the fraudulent ballots. Even in the face of armed police officers, A.F.P. refused to participate in these corrupt practices.

21. Because he refused to accept the fraudulent ballots, the Honduran officers and their accomplices handcuffed and tortured A.F.P. They punched, kicked, and beat A.F.P. with heavy rifles. Then, the group transported A.F.P. in a police patrol car to a cemetery, where they further tortured and sexually abused A.F.P. When A.F.P. regained consciousness following this torture and abuse, he found himself alone, soaked in his own blood, covered with bruises, and his finger broken. To this day, A.F.P.'s finger remains damaged, and the repeated blows to his head have affected his memory.

22. A.F.P. reported his abduction and torture to the police; however, this only made matters worse. Just days after his report, the same police officers who had abused him before again set upon and abducted A.F.P. from his home. This time, military personnel and civilians with tattoos on their arms also accompanied the police. They took A.F.P. from his family to a bridge, where they beat him again. During this second abduction, the group threatened to kill A.F.P.'s family, specifically his wife and son, and also threatened to force J.F.C. into a gang.

23. A.F.P. managed to escape by jumping off the bridge. He returned home to find his house reduced to ashes. Fortunately, his family had fled and was safe for the time being; however, A.F.P. knew that it would be impossible to stay hidden from harm unless his family left Honduras. The family decided that A.F.P. and his son should be the first to enter the United States to seek asylum.

**B.** **Defendant's Employees Forcibly Separated Plaintiffs When They Sought Asylum in the United States.**

24. On or about January 29, 2018, A.F.P. and J.F.C. crossed the Rio Grande border and entered the United States near McAllen, Texas. Upon spotting a United States Customs and Border Protection (CBP) patrol car, the father and son voluntarily approached so that they could seek asylum. They were instead arrested and stripped of all their personal belongings.

25. After the arrest, immigration officers took Plaintiffs to a CBP facility known as a "*hielera*," or "ice box," because of its cold temperatures. Immigration officers forcibly separated A.F.P. and J.F.C. almost immediately after they arrived at the *hielera*. During their two days together at the *hielera*, Plaintiffs were only permitted to speak to each other for thirty minutes per day.

26. On the third day, CBP officers dragged A.F.P. from his sleep into a courtroom, where he was charged with illegal entry in violation of 8 U.S.C. § 1325. A.F.P. was never asked about or given a chance to explain his asylum claim, nor was he provided with an attorney or legal information about his case. The proceedings were conducted in English. A.F.P. does not speak English and was not provided with a translator. He had no idea what was going on.

27. While this charade of a court hearing was occurring, and without any prior warning, CBP officers whisked J.F.C. off to New York. CBP officers gave J.F.C. no information about where he was going or why. When A.F.P. returned to the detention center, his son was gone. The officers told A.F.P. that his son would remain in New York and that he would be deported. A.F.P. feared that he would never see his son again.

28. A.F.P. and J.F.C. would not see each other again for approximately *fifteen months*.

C. **Defendant's Employees Improperly Used a Federal Prosecution to Justify A.F.P.'s Separation from J.F.C.**

29. A.F.P.'s prosecution was part of a policy launched by the Department of Justice on April 6, 2018. That day, then-Attorney General Jeff Sessions publicly announced a "Zero Tolerance" directive to all United States Attorneys along the southern border, including in Texas, to prosecute anyone who committed the misdemeanor offense of unlawful entry or re-entry in violation of 8 U.S.C. § 1325(a). Previously, asylum seekers, especially families, had not been systematically referred for prosecution for the misdemeanor of crossing the border improperly. Over the last 20 years, less than one-third of apprehensions by CBP have resulted in criminal prosecutions, and any sentences imposed tended to be short, ranging from two to 15 days.

30. The "Zero Tolerance" announcement was conceived of, upon information and belief, by Attorney General Sessions, Department of Homeland Security (DHS) Secretary Kristjen Nielsen, and White House adviser Stephen Miller, among others.

31. The policy served as a pretext or cover for the goal of furthering the widespread separation of Central American parents and children along the southern border. Indeed, Secretary Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Attorney General Sessions prior to the "Zero Tolerance" announcement.

32. Consistent with the "Zero Tolerance" policy, United States government officials began routinely prosecuting parents who crossed the border illegally. Parents convicted under "Zero Tolerance" usually received a sentence of time served that amounted to, at most, a few days in jail, after which the parent would be returned to immigration custody. In fact, in many cases, the target of the "Zero Tolerance" policy did not serve *any* time in jail, but instead remained in CBP or United States Immigration and Customs Enforcement (ICE) custody. Nonetheless, children were taken away during this brief period, often flown across the country, and not returned to the parent— even where the parent was sentenced to time served.

33. The government officials who formulated the "Zero Tolerance" policy knew or reasonably expected that parents who unlawfully entered the United States with children and were prosecuted under this policy would serve either little or no jail time. They also knew or reasonably expected that this policy and the prosecutions under 8 U.S.C. § 1325 taken pursuant to the policy would result in the separation of children from their parents. As a result, they knew or reasonably expected that a parent's prosecution would provide no real justification for a parent's days, weeks, months, or even years-long separation from their child.

34. As with most Zero Tolerance prosecutions under 8 U.S.C. § 1325(a)(1), A.F.P. was initially sentenced to time served. Until government employees tricked him into withdrawing his credible asylum claim, as further discussed below, A.F.P. never entered the custody of the Bureau of Prisons (BOP), and other than his brief appearance in the courthouse, A.F.P. was in United States Department of Homeland Security (DHS) custody when his son J.F.C. was shipped to New York.

35. A.F.P.'s court hearing for his illegal entry charge took just a few hours. However, despite never entering BOP custody and having only a single, brief court appearance, CBP and ICE used A.F.P.'s federal court proceedings and prison sentence to designate J.F.C. an "unaccompanied minor." *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279(b).

36. As a result of that designation, ICE and CBP treated J.F.C. as if he were legally in the custody of the Office of Refugee Resettlement (ORR). ICE and CBP made that determination even though A.F.P. and J.F.C. entered the country together, were initially in immigration custody together, and A.F.P. was never held in a non-immigration detention facility except for the few hours he spent on one occasion in federal court.

37. When Defendant's employees separated Plaintiffs they knew, or, at a minimum, reasonably expected, that A.F.P. would not be held in BOP custody at that time or that he would be put in custody for only a matter of a few days. There was no reason for government officials to send J.F.C. to a facility thousands of miles away.

**D.   Defendant's Employees Subjected A.F.P. to Inhumane Detention Conditions and Emotional Abuse.**

38. Immigration officers detained A.F.P. in the *hielera*—also referred to by the inmates as the "perrara" or "dog kennel"—for three days. Apart from the cold, the *hielera* was cramped, dirty, and uncomfortable. Immigration officials packed adult men into an area enclosed by a wire fence. The adults could see their children through the wires, but they could not touch or even talk to them.

39. During his confinement, the officers provided A.F.P. with insufficient food, water, and space. At meal times, they gave him just a frozen sandwich and frozen milk to eat and drink. A.F.P. had to wait until his food thawed, and even then, it was barely edible because it was past the expiration date. Packed into the enclosure with about fifty other men, he did not even have space to sit down.

40. In addition to the physical deprivation, CBP officers deprived A.F.P. of contact with his son, which caused A.F.P. severe anguish. The officers worsened this suffering by telling A.F.P. that they were going to deported him but not his son—threatening that he would be separated from

his son forever. Confined in an ice-cold kennel, without a blanket, A.F.P. had to stand and think about losing his son permanently. With the fluorescent lights on twenty-four hours a day and the constant murmuring of others around him, A.F.P. could not even escape into sleep.

41. After the officers separated A.F.P. and J.F.C., they briefly transferred A.F.P. to Port Isabel, Texas, before transferring him again to the Rio Grande Detention Facility in Laredo, Texas.

42. For two days, A.F.P. was not allowed to communicate with his son, J.F.C., who had just been forcibly removed to New York. Two days into his stay at Rio Grande, officers finally allowed A.F.P. to communicate with his son. J.F.C. was depressed, crying, and terrified that his dad, A.F.P., would be deported. A.F.P. assured his son he would have his legal process, but that legal process never came.

43. As in the *hielera*, detention officers forced A.F.P. to live in inhumane conditions at the Rio Grande Detention Facility. There, the officers packed seventy to eighty men into a pavilion area of a housing unit that was crammed with beds, leaving very little space to move. There were only a few restrooms for the eighty men to share and the officers provided only one communal water bucket a day. With eighty men fighting to get a sip of water, the bucket ran out almost immediately, forcing the men to try to drink from the sinks.

44. The food at the Rio Grande Detention Facility was also insufficient and nearly inedible. Officers gave A.F.P. a few cornflakes and half of a banana for breakfast at 4:00 a.m. Eight hours later, they provided him with two small pieces of bread or half an egg. For dinner, they provided him with another paltry snack portion. The food always tasted bad, was always nearly frozen, and was often expired.

45. As the inhumane physical conditions took their toll on A.F.P., so too did the officers' emotional abuse and manipulation. A.F.P. had to wait thirty days before getting any information about his case or being interviewed him about his fear of returning to Honduras. During these thirty days, the officers in the detention center encouraged A.F.P.'s feelings of hopelessness by telling him his case was a waste of time.

46. After his initial phone call with J.F.C., the immigration officers told A.F.P. he would have to wait an entire month before he could speak with his son again. A.F.P. repeatedly asked to

speak to his son, but after twenty-two days, the officers still refused. Out of desperation, A.F.P. began a hunger strike. On the third day of his hunger strike, officers placed A.F.P. in solitary confinement and finally gave him a phone to speak with his son. But, after nearly thirty days of no contact, A.F.P. was given only a few minutes to talk his frightened and lonely child.

E. **Defendant's Employees Denied A.F.P. the Right to Seek Asylum and Tricked Him into Withdrawing His Valid Asylum Claim.**

47. This was a critical point for A.F.P. He had no idea how long his asylum case was going to take, and it took starving himself to get any contact with his son. By the time his asylum interview finally occurred, he had felt hopeless for a month, a feeling exacerbated by the emotional abuse and taunting of the CBP officers.

48. During a two-hour interview, an asylum officer told A.F.P. what he had known all along—that he had a credible case. The asylum officer told A.F.P. that he would have to wait five or six days to get a response, but that the government could not deport him back to Honduras. A.F.P. should have received this information soon after entering the United States, not over thirty days after he entered, and not after he had been separated from his son. Additionally, this information confused A.F.P. because the CBP officers had been telling him the opposite for the last month.

49. Despite finally receiving news that he had a credible case for asylum and would not be deported, the detention center officers continued their psychological and emotional mistreatment of A.F.P. and the other inmates. At the detention center, the officers put a notary public in a separate room and called her a "lawyer." When immigrants like A.F.P. asked to speak with someone about their case, the officers did not put them in contact with one of the local legal services organizations that regularly assist immigration detainees, but instead took them to this woman.

50. This fake "lawyer" told A.F.P. that he was wasting his time and taxpayer money, and that he was going to be deported anyway. She told him that it would take five or six months before they could release him from the detention center. Not understanding his legal rights, this woman confused A.F.P. with conflicting information. He was terrified to return home, but he was desperate to speak with his son. He was looking at a no-win situation.

51. When it came time to speak to a judge, the judge declared A.F.P. ineligible for bond. Due to the confusion and misinformation sown by the CBP officers and their fake "lawyer" accomplice, A.F.P. believed he was facing a cruel choice: withdrawing his asylum application, accepting removal, and facing the prospect of torture in Honduras, or maintaining his asylum claim, remaining in prison for at least many months while awaiting an asylum hearing, and losing contact with his son—perhaps forever. He chose the former and—despite having a credible claim for asylum—withdrew his asylum application and accepted his deportation.

52. During these proceedings, the judge never asked A.F.P. if he had an attorney, nor was an attorney offered to him. No one explained to A.F.P. the consequences of withdrawing his application. A.F.P. believed this was the only way he could regain contact with his son.

F. **After A.F.P. Was Transferred to Maximum Security Prisons in Ohio and Louisiana, Only Got Worse.**

53. Instead of deporting A.F.P. right away, the officers transferred A.F.P. to a maximum-security prison in Ohio, a prison generally reserved for inmates who exhibit violent behavior. At the prison, A.F.P. shared an individual prison cell with another person. The guards only allowed the men to come out of their cell for food, which again, was not enough. In fact, the food was so meager that A.F.P. cleaned restrooms to get additional money to buy food from the prison store. A.F.P. was imprisoned in Ohio for approximately fifteen days and he was not allowed to contact his son at all.

54. From Ohio, the government transferred A.F.P. to another maximum-security prison in Louisiana where he was subjected to perhaps the most inhumane conditions of all. For the entirety of his imprisonment in Louisiana, officers restrained A.F.P. with his hands, feet, and waist chained. Around A.F.P.'s neck was a metal collar, containing a chain that connected to his handcuffs and wrapped around his waist two times before connecting to his ankle shackles. The guards would only take him to the bathroom if he had to have a bowel movement, forcing A.F.P. to urinate on himself in chains. When the officers took him to the bathroom, he had no privacy inside. For food, the guards gave him a frozen sandwich and a little frozen milk.

55. A.F.P. remained in detention centers until May 13, 2018, when he was deported to Honduras, where his life was in danger. Defendant's deportation of A.F.P. was a violation of both the asylum provisions of the Immigration and Nationalization Act, *see, e.g.*, 8 U.S.C. § 1158, and a federal court order in *Ms. L. v. U.S. Immigration and Customs Enforcement*, Case No. 18-cv-428 (S.D. Cal.), requiring the family's reunification.

### G. Officers Continued to Abuse A.F.P. After Al Otro Lado Helped Him Re-Enter the United States.

56. After arriving back in Honduras, A.F.P. found out the police were still looking for him and his family. It was too dangerous to stay in Honduras. Fortunately, a U.S.-based human rights organization, Al Otro Lado, arranged for A.F.P. and his family to flee to Guatemala in October 2018. A.F.P. and his family—minus J.F.C., who remained in United States government custody in New York—stayed in Guatemala for four months. Al Otro Lado then arranged for the family to go to Mexico, and then eventually helped the family lawfully enter the United States near Calexico, California.

57. Upon his re-entry to the United States, CBP officers put a GPS monitor on A.F.P.'s ankle so they could track him inside the country. One officer asked A.F.P., "Why did you return if you came last time just to sell your son?" After over a year apart, this statement devastated A.F.P. because he feared the officers told his son that his family sold him to the United States.

58. A little over a week after entering the United States, A.F.P. was finally reunited with his son, J.F.C. But J.F.C. was not well. As further detailed below, J.F.C. was suffering from the trauma inflicted by the U.S. government, as well as an ear injury that, due to Defendant's neglect, has affected his hearing.

### H. CBP Officers Subjected J.F.C. to Inhumane Conditions, and Physically and Emotionally Abused Him.

59. Like his father, J.F.C. was also subjected to inhumane treatment at the *hielera*. CBP officers forced J.F.C. and the other detained children to sleep on the floor. Five hours after arriving at the *hielera*, the officers gave J.F.C. water and snack items, but the chips and burrito they gave

him tasted rancid, causing J.F.C. to vomit a short while later. His stomach ached from the expired food.

60. The officers also deprived J.F.C. of contact with his father, and J.F.C. recalls speaking with A.F.P. only one time during the two days he was detained at the *hielera*.

61. The morning the officers took his father to court, other officers removed J.F.C. to a separate area of the detention center and told him that he was going to "be taken." The officers did not tell J.F.C. who was taking him, why they were taking him, or where they were taking him. The officers separated the children into groups of ten and transported them to different cities. At the age of fifteen, J.F.C. felt scared and alone, headed to an unknown destination in a foreign country without his father.

### 1. The Inhumane Conditions and Emotional Abuse Continued in New York Detention Centers.

62. Officials took J.F.C. to an ORR-contracted detention center in New York. Because DHS and ICE designated J.F.C. an unaccompanied minor, ORR was charged by law with "coordinating and implementing the care and placement" of J.F.C. 6 U.S.C. § 279(b)(1); *see also* 8 U.S.C. § 1232(b)(1) ("[T]he care and custody of all unaccompanied [noncitizen] children . . . shall be the responsibility of the Secretary of Health and Human Services."). ORR thus remained legally responsible for J.F.C.'s adequate care and safety after it placed him in the New York detention center.

63. As detailed below, ORR failed to fulfill its statutory and regulatory obligations.

64. The detention center where officials placed J.F.C. was a house with four rooms and one communal bathroom. The staff packed four to five boys in each room, and around sixteen boys shared the single bathroom. Three staff guards also lived with the boys. The staff provided the children with food, but not water. The boys resorted to drinking water from the sink.

65. The staff rarely allowed the boys to play outside, but when they could, the boys played basketball. However, most of the time, J.F.C. attended school or stayed inside the detention center. J.F.C. remained at the first detention center for approximately a year before he was transferred to a different location. J.F.C.'s memory has been severely affected by the trauma,

making it difficult for him to recall the details about the time he was separated from his father and subjected to inhumane conditions and emotional abuse. J.F.C.'s best recollection is that while in the second program, he stayed with a foster parent for a few months.

66. In addition to the cramped conditions, the staff guards emotionally abused J.F.C. One night, J.F.C. got up to go to the bathroom, but a staff member refused to allow him to go. She claimed to be tired and did not want him to be awake. J.F.C. insisted that he had to go, but the staff member yelled at him for having to go to the bathroom. She physically barricaded the door so he could not get out to relieve himself. While the staff member eventually allowed him to go to the bathroom, the experience left him afraid, and deepened the trauma J.F.C. experienced.

67. On a separate occasion, J.F.C. approached a staff member about a misunderstanding with another child. Instead of helping the two resolve the issue, the staff member yelled at J.F.C., berating him for complaining, and punishing J.F.C. for speaking up. After this incident, J.F.C. did not go to the staff about any issue with the other boys for fear that he would be verbally attacked again.

### I. **J.F.C. Also Suffered Extreme Emotional and Psychological Trauma Due To Lack of Contact with His Father.**

68. Even though the children at the New York detention center had all been forcibly ripped from their parent's custody, they were provided with minimal psychological support. An on-call psychologist occasionally worked at the house, but she provided little guidance. J.F.C. tried reaching out to the psychologist and the staff about contacting his father, but they told him they could not help. The psychologist did not even attempt to look up A.F.P.'s case. The staff also did nothing to help J.F.C. contact his father.

69. This lack of contact severely traumatized J.F.C., and his memory from that time is repressed. Indeed, he does not remember the panicked call he made to his mother at 2:00 a.m. in the airport when he was being "taken."

70. The emotional and psychological trauma from being torn from his family has caused J.F.C. severe memory problems. Further psychological evaluations could reveal additional episodes

of trauma J.F.C. experienced. As it stands, J.F.C.'s memory of his detention is repressed, and he has trouble recounting his traumatic experience in New York.

**J.     Detention Staff Neglected J.F.C.'s Health, Causing Severe and Potentially Irreparable Injuries to His Ear.**

71.    In addition to emotional trauma, J.F.C. also was physically harmed while he was detained.

72.    On one of the rare occasions when J.F.C. was allowed to leave the confines of the detention center, he went to a local indoor swimming pool. At the pool, he slipped and fell, hitting his ear. After the fall, his ear hurt and some of the pool water clogged his ear. Despite J.F.C.'s complaints about pain in his ear, the staff did not take him to the hospital or seek any other treatment for J.F.C. They did not even check in on him over the next couple of days to see if it still hurt. J.F.C. reported the pain to the staff multiple times, but they never took him to the doctor.

73.    J.F.C. developed an ear infection that festered due to the lack of medical care. As a result of the detention center staff's neglect, J.F.C. has suffered hearing loss in his left ear.

**K.     Defendant's Conduct Harmed Plaintiffs.**

74.    As a direct result of the United States government's actions, Plaintiffs suffered significant physical and emotional harm.

75.    A.F.P. suffered physically from the abuse inflicted upon him by the CBP officers, ICE officers, and other government officers. They detained him in inhumane conditions, effectively starved him, and used unlawful levels of force against him when they severely restrained him. This abuse exacerbated his already existing memory problems, further damaged his fractured finger, and caused him to develop chronic migraines.

76.    A.F.P. suffers emotionally from the officers' abuse. While A.F.P. may have had anxiety and depression prior to entering the United States due to his torture in Honduras, the United States government's conduct greatly exacerbated his conditions. He has periodic panic episodes, where he fears the government will take away his son. He is depressed from his own trauma and the trauma his son suffered. He is also depressed because of how much important time he missed

from his son's life and because he was forced to be away from him during challenging and traumatic times.

77. J.F.C. suffers physically from the trauma and abuse various government officers and staff members inflicted on him. The detention conditions caused J.F.C. to develop chronic headaches. Additionally, because the staff never took J.F.C. to a hospital following the injury to his ear, J.F.C. still has hearing problems with his left ear.

78. J.F.C. suffers emotionally from the severe trauma due to the separation from his father and his mistreatment at the New York detention facility. He has anxiety, depression, and trouble sleeping. In addition, his memory is severely affected.

79. Finally, the immigration officers' actions offended Plaintiffs' rights to family integrity, their dignity, and their sense of belonging. Despite finally reaching the United States—which has statutorily committed itself to providing asylum to qualified refugees—immigration officers treated Plaintiffs as people without rights and without a voice. They ignored A.F.P.'s valid and well-supported fear of returning to Honduras, and—through forced separation and detention—punished A.F.P. and J.F.C. for seeking safety in the United States.

80. Defendant's employees forcibly separated Plaintiffs as part of an unprecedented government practice and policy of forced family separation. Defendant's employees did so in disregard for Plaintiffs' statutory and constitutional rights, their dignity as persons, and their love for one another as a family. Plaintiffs suffered and continue to suffer significant emotional trauma because of their forced separation by the concerted efforts of Defendant's employees.

81. That separation, and the other wrongful acts that United States government officers and their agents inflicted upon Plaintiffs, results in Defendant's employees being liable to Plaintiffs under the FTCA and relevant state law.

## FIRST CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

82. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

83. Defendant's employees acted intentionally and/or recklessly through their implementation of an unprecedented government policy of forced separation.

84. Defendant's employees engaged in conduct that was extreme and outrageous.

85. Defendant's employees engaged in conduct that caused Plaintiffs severe emotional distress.

86. Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of emotional distress.

## SECOND CLAIM FOR RELIEF

## ABUSE OF PROCESS

87. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

88. Defendant's employees abused legal processes within their control when they used the prosecution under 8 U.S.C. § 1325 against A.F.P. in order to designate J.F.C. an unaccompanied minor.

89. Defendant's employees improperly made the unaccompanied minor designation, relying on A.F.P.'s prosecution under 8 U.S.C. § 1325 to justify the separation of A.F.P. and J.F.C. and to traumatize A.F.P. and J.F.C.

90. Defendant's employees' abuse of process caused Plaintiffs severe harm, including emotional distress.

91. Under the FTCA, Defendant is liable to Plaintiffs for abuse of process.

## THIRD CLAIM FOR RELIEF

## NEGLIGENCE – FAMILY SEPARATION

92. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

93. Defendant's employees had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.

94. Defendant's employees failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

95. As a direct and proximate result of the conduct described in this Complaint, Plaintiffs suffered substantial damages.

96. Under the FTCA, Defendant is liable to Plaintiffs for negligence.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE – J.F.C.'S TIME IN ORR CUSTODY

97. Plaintiffs reallege and incorporate by reference the preceding allegations in this Complaint as if fully set forth herein.

98. Defendant's employees had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to Plaintiff J.F.C. while he was in Defendant's custody.

99. Defendant's employees failed to act with ordinary care and breached their duty of care owed to Plaintiff J.F.C.

100. As a direct and proximate result of the conduct described in this Complaint, J.F.C. suffered substantial damages.

101. Under the FTCA, Defendant is liable to Plaintiff J.F.C. for negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Compensatory damages in the amount of $3,000,000 for harm to A.F.P. resulting from Defendant's conduct;

B. Compensatory damages in the amount of $3,000,000 for harm to J.F.C. resulting from Defendant's conduct; and

C. Such other and further relief as the Court deems just and appropriate, including all equitable relief to which Plaintiffs are entitled.

DATED this 14th day of May, 2021.

**MORGAN, LEWIS & BOCKIUS LLP**

By: */s/ Kent W. Kraushaar*
Susan Baker Manning
Lisa R. Weddle
Kent W. Kraushaar

*Attorneys for Plaintiffs A.F.P and J.F.C.*