1  PHILLIP A. TALBERT
   United States Attorney
2  DAVID T. SHELLEDY
   Civil Division Chief
3  VICTORIA L. BOESCH
   Assistant United States Attorney
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700

6  Attorneys for the United States

7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11  A.F.P. and J.F.C.,                    CASE NO. 1:21-cv-00780-DAD-EPG

12              Plaintiffs,               MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF
13       v.                               MOTION TO TRANSFER

14  United States of America,             DATE:   March 15, 2022
                                          TIME:   9:30 a.m.
15              Defendant.                COURT:  Hon. Dale A. Drozd
                                                  Courtroom 5
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    FACTUAL AND LEGAL BACKGROUND ......................................................1

    A.     Statutory Framework for Noncitizens Entering the Country. ................................1

    B.     Statutory Framework for Immigration Custody of Unaccompanied Minors......................2

    C.     Flores Agreement Requirements.............................................3

    D.     Executive Branch Directives Regarding Immigration Enforcement. ...................4

    E.     Detention, Separation and Reunification of Plaintiffs. ..........................5

    F.     Subsequent Policy Changes. .................................................6

    G.     Plaintiffs' Complaint.............................................................7

III.   LEGAL STANDARDS ........................................................................................7

    A.     Transfer Under 28 U.S.C. § 1404(a)..............................................7

IV.    ARGUMENT .......................................................................................................8

    A.     The Court Should Transfer This Action to the Southern District of Texas. .......................8

        1.     Venue Is Proper in the Southern District of Texas. ..........................8

        2.     The Balance of Relevant Factors Strongly Favors Transfer.........................9

            a.     Most Operative Facts Occurred in the Southern District of Texas. ..............................10

            b.     Texas Law Governs the Majority of Plaintiffs' Claims.............................10

            c.     The Convenience and Interests of the Parties Favor Transfer to the Southern District of Texas. .................................11

            d.     Plaintiffs' Choice of Forum Should Be Given Little Weight. .................13

            e.     The Interests of Justice Favor Transfer to the Southern District of Texas........................14

V.     CONCLUSION....................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*Amazon.com v. Cendant Corp.*,
　404 F. Supp. 2d 1256 (W.D. Wash. 2005) ........................................................................ 14

*Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*,
　571 U.S. 49 (2013) ........................................................................................................ 8, 14

*Barroca v. United States*,
　No. 19-cv-699, 2019 WL 5722383 (N.D. Cal. Nov. 5, 2019) ........................................ 9, 11

*Bromlow v. D & M Carriers, LLC*,
　438 F. Supp. 3d 1021 (N.D. Cal. 2020) ............................................................................... 8

*Bunikyte v. Chertoff*,
　No. 07-164, 2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) ................................................... 4

*Canal A Media Holding, LLC v. United States Citizenship & Immigration Servs.*,
　No. 17-cv-6491, 2018 WL 7297829 (C.D. Cal. Sept. 30, 2018) ......................................... 15

*Commodity Futures Trading Comm'n v. Savage*,
　611 F.2d 270 (9th Cir. 1979) .............................................................................................. 8

*Conrad v. United States*,
　447 F.3d 760 (9th Cir. 2006) ............................................................................................ 10

*Decker Coal Co. v. Commonwealth Edison Co.*,
　805 F.2d 834 (9th Cir. 1986) .............................................................................................. 8

*Flores v. Lynch*,
　828 F.3d 898 (9th Cir. 2016) .......................................................................................... 3, 4

*Flores v. Rosen*,
　984 F.3d 720 (9th Cir. 2020) .............................................................................................. 3

*Flores v. Sessions*,
　No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) ............................................................................. 3

*Gatdula v. CRST Int'l, Inc.*,
　No. 2:10-cv-58, 2011 WL 445798 (E.D. Cal. Feb. 8, 2011) ................................................ 8

*Hansen v. Combined Transp., Inc.*,
　No. 13-cv-1298, 2013 WL 5969863 (W.D. Wash. Nov. 7, 2013) ................................. 11, 14

*Jones v. GNC Franchising, Inc.*,
    211 F.3d 495 (9th Cir. 2000) ............................................................................... 8, 10

*Koval v. United States*,
    No. 2:13-cv-1630, 2013 WL 6385595 (D. Ariz. Dec. 6, 2013) ............................. 9

*Martinez v. Knight Transportation, Inc.*,
    No. 1:16-cv-1730, 2017 WL 2722015 (E.D. Cal. June 23, 2017) .................... 11, 15

*Nordquist v. Blackham*,
    No. C06-5433 FDB, 2006 WL 2597931 (W.D. Wash. Sept. 11, 2006) ............. 13, 14

*Park v. Dole Fresh Vegetables, Inc.*,
    964 F. Supp. 2d 1088 ........................................................................................... 13

*Pizana v. SanMedica Int'l LLC*,
    No. 1:18-cv-644, 2020 WL 469336 (E.D. Cal. Jan. 29, 2020) ........................... 11

*Stewart Org., Inc. v. Ricoh Corp.*,
    487 U.S. 22 (1988) ................................................................................................ 9

*Trevino v. Golden State FC, LLC*,
    No. 1:17-cv-1300, 2019 WL 6790763 (E.D. Cal. Dec. 12, 2019) ....................... 9

*United States v. [AFP]*,
    No. 7:18-po-01524 (S.D. Tex. Jan. 31, 2018) ..................................................... 6

*United States v. Dominguez-Portillo*,
    No. 17-MJ-4409, 2018 WL 315759 (W.D. Tex. Jan. 5, 2018) .......................... 3, 4

State Cases

*Cooper v. Trent*,
    551 S.W.3d 325 (Tex. App. 2018) ....................................................................... 11

Federal Statutes

6 U.S.C. § 279(a) ..................................................................................................... 2

6 U.S.C. § 279(b)(1)(A) ............................................................................................ 2

6 U.S.C. § 279(b)(1)(C) ............................................................................................ 2

6 U.S.C. § 279(2)(B) ................................................................................................. 3

6 U.S.C. § 279(g)(2) ................................................................................................. 2

8 U.S.C. § 1182(d)(5) ............................................................................................... 2

8 U.S.C. § 1225(b) ............................................................................................................... 2

8 U.S.C. § 1226(a)(2) .......................................................................................................... 2

8 U.S.C. § 1231 ................................................................................................................ 2, 5

8 U.S.C. § 1232(b)(1) .......................................................................................................... 2

8 U.S.C. § 1232(b)(3) .......................................................................................................... 3

8 U.S.C. § 1232(c)(2)(A) ..................................................................................................... 3

8 U.S.C. § 1232(c)(3) .......................................................................................................... 3

8 U.S.C. § 1232(c)(3)(A) ..................................................................................................... 3

8 U.S.C. § 1232(c)(3)(B) ..................................................................................................... 3

8 U.S.C. § 1325 ........................................................................................................... 4, 5, 8

8 U.S.C § 1325(a) ............................................................................................................. 2, 5

8 U.S.C. § 1325(a)(1) .......................................................................................................... 6

8 U.S.C. § 1326 ................................................................................................................... 2

8 U.S.C. § 1357 ................................................................................................................... 2

28 U.S.C. § 1346(b)(1) ........................................................................................................ 7

28 U.S.C. § 1402(b) ......................................................................................................... 7, 9

28 U.S.C. § 1404(a) .................................................................................................. 1, 7, 8, 9

## Executive Orders

Establishment of Interagency Task Force on the Reunification of Families,
    Exec. Order 14011, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021) ...................................... 1, 7

Border Security and Immigration Enforcement Improvements,
    Exec. Order 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017) ............................................... 4, 5

# I.   **INTRODUCTION**

This is an action under the Federal Tort Claims Act ("FTCA") alleging injuries to a father and son caused by implementation of zero-tolerance policies for noncitizens detained on suspicion of illegal entry at the United States–Mexico border in January 2018.  Plaintiffs assert three causes of action under Texas tort law for intentional infliction of emotional distress, abuse of process, and negligence arising out of plaintiffs' separation after crossing into the United States, and one cause of action under New York tort law for negligent treatment of the minor plaintiff while he was in the care and custody of a charitable organization and foster family there.  *See* ECF No. 1 ("Complaint") ¶¶ 82-101.

The United States has denounced the prior practice of separating children from their families at the United States–Mexico border and "condemn[ed] the human tragedy that occurred [because of] the Zero-Tolerance Policy."  *Establishment of Interagency Task Force on the Reunification of Families*, Exec. Order 14011, § 1, 86 Fed. Reg. 8273, 8273 (Feb. 5, 2021) ("Family Reunification Task Force EO").  The Biden Administration has committed the federal government to "protect family unity and ensure that children entering the United States are not separated from their families, except in the most extreme circumstances where a separation is clearly necessary for the safety and well-being of the child or is required by law."  *Id.*

This Court should not reach the merits of plaintiffs' claims, however, because the Southern District of Texas is the most appropriate forum for this litigation.  Plaintiffs unlawfully crossed the United States–Mexico border into the state of Texas.  They were separated from each other in Texas. They both were detained in Texas.  And most allegations of the Complaint allege wrongful acts and omissions in Texas.  No wrongful conduct is alleged to have occurred in this District or anywhere else in California.  The Court should therefore transfer this action to the Southern District of Texas (McAllen Division) pursuant to 28 U.S.C. § 1404(a), for the convenience of the parties and witnesses and in the interest of justice.

# II.   **FACTUAL AND LEGAL BACKGROUND**

## A.   **Statutory Framework for Noncitizens Entering the Country.**

Under Title 8 of the U.S. Code, when a noncitizen enters the United States between official ports of entry, he or she may be subject to prosecution for criminal immigration violations, including entering

the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers."  8 U.S.C. § 1325(a).  Violation of Section 1325(a) is a misdemeanor punishable by a fine and "imprison[ment for] not more than 6 months" for a first infraction.  *Id*.  A subsequent violation may result in imprisonment of not more than two years.  *Id.* Reentering the United States without authorization after having been previously removed is a felony.  8 U.S.C. § 1326.  An individual who reenters the United States without authorization after having been removed "shall be fined under Title 18, or imprisoned not more than 2 years, or both."  *Id.* § 1326(a).

All noncitizens who arrive in the United States, including those who arrive between ports of entry, are considered "applicant[s] for admission" and are "inspected by immigration officers" to determine their admissibility to the United States.  8 U.S.C. § 1225(b).  Noncitizens arriving in or present in the United States who following inspection are deemed inadmissible also are subject to removal from the United States and, as appropriate, detention pending such removal.  *See id*. §§ 1225(b), 1226, 1231, 1357.  These provisions apply to both adults and children who are accompanied by their parents.  In some circumstances, the Department of Homeland Security ("DHS") may exercise its discretion to release a noncitizen from custody.  *See, e.g.*, 8 U.S.C. §§ 1182(d)(5), 1226(a)(2).

### B. Statutory Framework for Immigration Custody of Unaccompanied Minors.

Federal immigration law authorizes the United States to provide for the custody and care of minor children entering the United States without authorization.  Specifically, the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") is charged with "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status."  6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The term "unaccompanied alien child" or "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom . . . there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g)(2).

Under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), "[e]xcept in the case of exceptional circumstances, any department or agency . . . shall transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is an unaccompanied alien

child." 8 U.S.C. § 1232(b)(3).  ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child."  *Id.* § 1232(c)(2)(A).  However, ORR "shall not release such children upon their own recognizance."  6 U.S.C. § 279(2)(B).  Rather, once in ORR custody, there are detailed statutory and regulatory provisions that must be applied before the child is released to an approved sponsor.  *See* 8 U.S.C. § 1232(c)(3).  Congress requires that "an unaccompanied alien child may not be placed with a person . . . unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being" and that "[s]uch determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  *Id.* § 1232(c)(3)(A).  In some instances, a home study is required.  *Id.* § 1232(c)(3)(B).

## C.   Flores Agreement Requirements.

In 1996, the federal government entered into a settlement agreement referred to as the "Flores Agreement."  *See, e.g., Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).  The Flores Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [immigration authorities]."  *Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) (citing Flores Agreement ¶ 9).  Under a binding interpretation of the Ninth Circuit, the Flores Agreement applies both to unaccompanied minors and to minors who are encountered together with their parents or legal guardians.  *Id.* at 901.  Under the Flores Agreement, the government must expeditiously transfer any minor who cannot be released from custody to a non-secure, licensed facility.  *Id.* at 902-03 (quoting Flores Agreement ¶ 12).  The government must also "make and record the prompt and continuous efforts on its part toward . . . release of the minor."  *Flores v. Rosen*, 984 F.3d 720, 738 (9th Cir. 2020) (quoting Flores Agreement ¶ 14).

The Flores Agreement applies only to minors.  *Flores*, 828 F.3d at 901.  It "does not address . . . the housing of family units and the scope of parental rights for adults apprehended with their children[,]" and it "does not contemplate releasing a child to a parent who remains in custody, because that would not be a 'release.'"  *Flores*, 828 F.3d at 906; *see also United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *9 (W.D. Tex. Jan. 5, 2018) ("[*Flores*] does not provide that parents are

entitled to care for their children if they were simultaneously arrested by immigration authorities[.]").

Nor does the Flores Agreement provide any rights to adult detainees, including any rights of release.

*Flores*, 828 F.3d at 908; *see also Dominguez-Portillo*, 2018 WL 315759, at \*14-15; *Bunikyte v.*
*Chertoff*, No. 07-164, 2007 WL 1074070, at \*16 (W.D. Tex. Apr. 9, 2007).  Although the Flores

Agreement gives preference to release of minors to a parent, this preference "does not mean that the

government must also make a parent available; it simply means that, if available, a parent is the first

choice." *Flores*, 828 F.3d at 908.

> **D.**    **Executive Branch Directives Regarding Immigration Enforcement.**

In 2017 and 2018, the Executive Branch issued several directives regarding enforcement of

federal immigration laws.  Executive Order 13767 § 1, 82 Fed. Reg. 8793 (Jan. 30, 2017).  First, in

January 2017, then-President Trump issued Executive Order No. 13767 ("EO 13767"), stating that "[i]t

is the policy of the executive branch to. . . detain individuals apprehended on suspicion of violating

Federal or State law, including Federal immigration law, pending further proceedings regarding those

violations[.]"  *Id*. § 2(b).  Executive Order 13767 directed DHS to "ensure the detention of aliens

apprehended for violations of immigration law pending the outcome of their removal proceedings or

their removal from the country to the extent permitted by law," *id*. § 6, and to exercise its parole

authority "only on a case-by-case basis in accordance with the plain language of the statute . . . and in all

circumstances only when an individual demonstrates urgent humanitarian reasons or a significant public

benefit derived from such parole."  *Id*. § 11(d).

Second, on April 11, 2017, the Department of Justice ("DOJ") issued guidance to all federal

prosecutors regarding a renewed commitment to criminal immigration enforcement and directed that

federal law enforcement prioritize the prosecution of several immigration offenses, including illegal

entry under 8 U.S.C. § 1325.  *See* U.S. DOJ Memorandum on Renewed Commitment to Criminal

Immigration Enforcement (April 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download.

As noted above, the separation in this case occurred in January 2018.  Several months later, on

April 6, 2018, then-Attorney General Sessions issued a "Memorandum for Federal Prosecutors along the

Southwest Border" (the "Zero-Tolerance Memorandum"), available at

1  https://www.justice.gov/opa/press-release/file/1049751/download.  The memorandum directed federal

2  prosecutors along the Southwest border "to the extent practicable, and in consultation with DHS, to

3  adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section

4  1325(a)."  *Id.*  Consistent with EO 13767 and the April 2018 Zero-Tolerance Memorandum, DHS began

5  to refer for prosecution increased numbers of adults – including those traveling with children – who

6  unlawfully entered the United States on the Southwest border in violation of Section 1325.  *See*

7  *generally* Executive Order 13767.  Minor children of those adults were transferred to ORR custody as

8  required by the TVPRA.  *See supra* at 2-3.

9        **E.**    **Detention, Separation, and Reunification of Plaintiffs.**

10        According to the Complaint, plaintiffs are a father and son from Honduras, who illegally crossed

11  the United States-Mexico border in January 2018 near McAllen, Texas.  ECF No. 1 ¶¶ 16-17, 24.

12  Shortly after crossing the border, plaintiffs were apprehended by U.S. Customs and Border Protection

13  ("CBP") Border Patrol Agents.  Declaration of Brian S. Hastings ("Hastings Decl.") ¶¶ 6-7.  Plaintiffs

14  were transported to CBP's Rio Grande Valley Centralized Processing Center ("RGV Processing

15  Center") in McAllen, where plaintiff AFP was interviewed by Border Patrol Agents, processed for

16  reinstatement of prior removal orders pursuant to 8 U.S.C. § 1231, and referred for criminal prosecution

17  under 8 U.S.C. § 1325 because he had been deported after unlawfully entering the United States three

18  times before.  *See id.* ¶ 7-8.

19        Plaintiffs were separated from each other during their initial custody at the RGV Processing

20  Center.  Complaint (ECF No. 1) ¶¶ 24-25; *see also* Hastings Decl. ¶¶ 6-9 (noting plaintiffs' separation

21  occurred in Texas).  JFC, the minor, was then processed as an unaccompanied child, transferred into the

22  care and legal custody of ORR on January 31, 2018, and placed the same day in the care of the

23  Children's Village charitable organization in New York.  Declaration of James De La Cruz ("James De

24  La Cruz Decl.") ¶ 4.  Children's Village provides care and shelter for unaccompanied children in the

25  United States.  Its goal is to find a family sponsor to care for the child or, when that is not possible, to

26  find a suitable foster family.  *Id.*  Efforts to locate a willing sponsor for JFC began within days of his

27  arrival, but none could be found; so ORR ultimately placed him in the care of a foster family in New

28  York.  *Id.* ¶¶ 4-5.  Thus, he spent seven months living on the Children's Village campus (January 31-

August 22, 2018), followed by another seven months living with a foster family (August 22, 2018-March 18, 2019).  *Id.*  Contrary to the Complaint (ECF No. 1 ¶¶ 62-67), JFC was never held in any "detention center" in New York.  *Id*.

Meanwhile, on January 31, 2018, AFP appeared before the U.S. District Court for the Southern District of Texas, entered a guilty plea, was convicted of violating 8 U.S.C. § 1325(a)(1), and was sentenced to time served.  Hastings Decl. ¶¶ 10-11; Judgment (ECF No. 3), *United States v. [AFP]*, No. 7:18-po-01524 (S.D. Tex. Jan. 31, 2018).  The Complaint in this case calls AFP's criminal hearing in the Texas federal court "a charade" and alleges that he was not provided with an attorney or a translator and "had no idea what was going on."  ECF No. 1 ¶¶ 26-27.  The court record, however, reflects that he was represented by the Office of the Federal Public Defender; that two interpreters were present; that he was advised of and waived his rights; and that the magistrate judge found his plea was voluntary and there was a factual basis for his plea.  Judgment (ECF No. 3) and Docket Report, No. 7:18-po-01524 (S.D. Tex.).

AFP remained in CBP custody in McAllen some hours more on January 31, 2018, then was transferred into ICE custody at the Port Isabel Processing Center near Los Fresnos, Texas, where he was formally booked into ICE custody the next morning.  ECF No. 1 ¶ 41; Declaration of Peter J. Brewster ("Brewster Decl.") ¶¶ 5, 6; Hastings Decl. ¶ 12.  The following day, he was transferred to another ICE facility, the Rio Grande Detention Center in Laredo, Texas, where he remained for 80 days, until April 23, 2018.  He was then transported to the Northeast Ohio Correctional Center in Youngstown, Ohio, where he remained for two weeks.  Brewster Decl. ¶¶ 2, 7, 9, 11.  Finally, he was transferred to Oakdale, Alexandria Staging Facility, in Alexandria, Louisiana on May 8, 2018, and was removed to Honduras on May 11, 2018.  *Id.* ¶ 9.

In March 2019, plaintiff AFP reentered the United States with his wife and daughter (JFC's mother and sister).  ECF No. 1 ¶ 56.  "A little over a week" after they arrived in the United States (ECF No. 1 ¶ 58), ORR reunited JFC with them in Los Angeles.  James De La Cruz Decl. ¶ 5.

**F.**   **Subsequent Policy Changes.**

After assuming office, President Biden took action to repudiate the policies that led to plaintiffs' separation and to reunify the families that were affected by those policies. On February 2, 2021, the

President issued an Executive Order that condemned the "human tragedy" of the prior Administration's

Zero-Tolerance Policy and committed the United States government to "protect family unity and ensure

that children entering the United States are not separated from their families, except in the most extreme

circumstances where a separation is clearly necessary for the safety and well-being of the child or is

required by law."  Family Reunification Task Force EO § 1.  That Order created a Task Force to identify

and reunify families separated under the Zero-Tolerance Policy, and to make recommendations for the

potential provision of immigration benefits and mental-health services to those separated families.  *Id.* §

4; *see also* Interim Progress Report, Interagency Task Force on the Reunification of Families 3, Nov. 29,

2021, available at https://www.dhs.gov/sites/default/files/publications/21_1129_s1_interim-progress-

report-family-reunification-task-force.pdf.

**G.   Plaintiffs' Complaint.**

Plaintiffs bring this action against the United States under the FTCA, 28 U.S.C. §§ 1346(b)(1),

2671-2680, seeking damages for intentional infliction of emotional distress in separating the father and

son plaintiffs (First Claim), abuse of process in using AFP's criminal prosecution to designate JFC as an

unaccompanied minor (Second Claim), negligence in separating plaintiffs (Third Claim), and negligence

while JFC was in the care and custody of ORR (Fourth Claim).  ECF No. 1 ¶¶ 82-101.  The Complaint

asserts that this District is a proper venue because plaintiffs reside here.  *Id.* ¶ 15.

## III.   LEGAL STANDARDS

**A.   Transfer Under 28 U.S.C. § 1404(a).**

In specified circumstances, the FTCA authorizes suit against the United States for conduct that

constitutes a tort under state law.  The applicable substantive state law is "the law of the place where the

act or omission occurred."  28 U.S.C. § 1346(b)(1).  Venue is governed by 28 U.S.C. § 1402(b), which

permits FTCA claims to be prosecuted "in the judicial district where the claimant resides or where the

act or omission occurred."  28 U.S.C. § 1402(b).

Even when venue is proper, 28 U.S.C. § 1404(a) authorizes transfer to a more convenient forum

in the interest of justice:

> For the convenience of parties and witnesses, in the interest of justice, a district court
> may transfer any civil action to any other district or division where it might have been
> brought or to any district or division to which all parties have consented.

*Id.*  A district court's analysis under Section 1404(a) considers both private factors, which go to the convenience of the parties and witnesses, and public factors, which go to the interests of justice.  *See Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western District of Texas*, 571 U.S. 49, 62-63 (2013); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).  In undertaking this analysis, courts weigh and consider various case-specific factors, including:

> (1) the location where the relevant agreements were negotiated and executed; (2) the state that is most familiar with the governing law; (3) the Plaintiff's choice of forum; (4) the respective parties' contacts with the forum; (5) the contacts relating to Plaintiff's cause of action in the chosen forum; (6) the differences in the costs of litigation in the two forums; (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses; and (8) the ease of access to sources of proof.

*Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498-99 (9th Cir. 2000).  "No single factor is dispositive and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis."  *Gatdula v. CRST Int'l, Inc.*, No. 2:10-cv-58, 2011 WL 445798, at *2 (E.D. Cal. Feb. 8, 2011).  The moving party bears the burden of establishing that the proposed transfer is appropriate.  *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979).  In evaluating a motion under Section 1404(a), a court may consider the allegations of the complaint as well as declarations submitted by the parties.  *See Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021, 1026 (N.D. Cal. 2020).

## IV.   ARGUMENT

### A.   The Court Should Transfer This Action to the Southern District of Texas.

#### 1.   Venue Is Proper in the Southern District of Texas.

This case could have been brought in the Southern District of Texas.  The separation of AFP and JFC is the gravamen of the Complaint (*see* ECF No. 1 ¶¶ 1-10, 24-37) and the express subject of three of its four claims.  The First Claim, for intentional infliction of emotional distress, rests on the allegation that employees of the United States "acted intentionally and/or recklessly through their implementation of an unprecedented policy of forced separation."  ECF No. 1 ¶ 84.  The Second Claim, for abuse of process, rests on the allegation that employees of the United States "rel[ied] on A.F.P.'s prosecution under 8 U.S.C. § 1325 to justify the separation of A.F.P. and J.F.C. and to traumatize [them]."  *Id.* ¶ 89.  The Third Claim is "NEGLIGENCE—FAMILY SEPARATION."  *Id.* at page 17.  The separation at the heart of all these claims occurred at the RGV Processing Center in McAllen.  Hastings Decl. ¶¶ 6-9.

McAllen also is where AFP's criminal prosecution (the process that allegedly was abused) occurred. ECF No. 1 ¶¶ 26-27.  In addition, the Complaint alleges that AFP was subjected to mistreatment at the Rio Grande Detention Facility in Laredo.  ECF No.1 ¶¶ 41-52.  Both McAllen and Laredo are in the Southern District of Texas.

Because most tortious acts or omissions are alleged to have occurred there, the Southern District of Texas is a proper venue under 28 U.S.C. § 1402(b), and transfer there is authorized by 28 U.S.C. § 1404(a).  *Cf. Barroca v. United States*, No. 19-cv-699, 2019 WL 5722383, *3 (N.D. Cal. Nov. 5, 2019) (granting motion to transfer in FTCA case where majority of allegations in plaintiff's complaint occurred in the transferee state); *Koval v. United States*, No. 2:13-cv-1630, 2013 WL 6385595, *4 (D. Ariz. Dec. 6, 2013) (granting motion to transfer case to Eastern District of California where "[t]he only connection that this case has to Arizona is that plaintiff happened to move there sometime after the events upon which his claims are based occurred").

### 2. The Balance of Relevant Factors Strongly Favors Transfer.

"Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Trevino v. Golden State FC, LLC*, No. 1:17-cv-1300, 2019 WL 6790763, at *2 (E.D. Cal. Dec. 12, 2019) (Drozd, J., quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).  Here, the convenience of the parties and witnesses substantially favors transfer.  All likely witnesses except plaintiffs themselves are at least hundreds of miles from this District; many of them are in the Southern District of Texas; and some critical, non-party rebuttal witnesses there are beyond the subpoena power of this Court.

The interests of justice also favor transfer.  Court congestion here is an "Ongoing Judicial Emergency" that "seriously hinder[s] the administration of justice throughout this district."  Standing Order (ECF No. 4-2) at 1, 2.  Because Congress has not expanded the bench here in more than four decades, the judges of  this Court have regularly carried a caseload double the nationwide average and the Court ranks among the slowest of all 94 federal districts in disposition of both civil and criminal cases.  *See infra* at 14-15.  Fewer than half as many civil cases per judge were filed last year in the Southern District of Texas as here.  In addition, that court is more familiar with the controlling tort law of Texas, and it has a greater local interest in official misconduct that is alleged to have occurred there.

In addition, the Southern District of Texas has a compelling interest in ensuring the integrity of its own proceedings, which the Complaint implicates when it alleges that the district court there conducted a "charade" of a hearing when it accepted AFP's guilty plea in circumstances that are contradicted by the court's official record.  For all these reasons, the case should be transferred.

> a.  **Most Operative Facts Occurred in the Southern District of Texas.**

The first factor (where the acts and omissions underlying plaintiffs' claims occurred[1]) favors transfer, because the great bulk of alleged wrongdoing occurred (if at all) in the Southern District of Texas.  The family separation that "this case is about" (Complaint, ECF No. 1 ¶ 1) occurred in the Southern District of Texas.  *Id*. ¶ 27; Hastings Decl. ¶¶ 6-9 (separation occurred at RGV Processing Center in McAllen).  Plaintiffs entered the United States in the Southern District of Texas, ECF No. 1 ¶ 5, and that is where both were apprehended, initially held in custody, and allegedly subjected to "inhumane conditions" and "emotional abuse."  *Id*. ¶¶ 24-25, 38-46; Hastings Decl. ¶¶ 6-9.  Texas is the only state where both plaintiffs were held in custody.  It is also where AFP was criminally prosecuted in a court hearing that the Complaint alleges was a "charade."  ECF No. 1 ¶¶ 6-7.  And it is where AFP allegedly was tricked and manipulated into withdrawing his asylum claim.  *Id*. ¶¶ 47-52.

By contrast, no wrongful conduct affecting either plaintiff is alleged to have occurred anywhere in California.  The Complaint alleges no contact at all between them and the state of California until *after* all alleged wrongdoing.

> b.  **Texas Law Governs the Majority of Plaintiffs' Claims.**

Factor two of the Ninth Circuit test (which state is "most familiar with the governing law") clearly favors transfer because the first three claims asserted by plaintiffs—all explicitly concerning family separation—sound in the common law of Texas, where the separation occurred.  *See, e.g., Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) ("In assessing the United States' liability under the FTCA, we are required to apply the law of the state in which the alleged tort occurred.").  No

---

[1] In *Jones*, *supra*, the Ninth Circuit listed the "location where the relevant agreements were negotiated and executed" as the first transfer factor because the central claims in that case rested on a franchise agreement and other contracts.  *See* 211 F.3d at 496, 498.  In this tort case, the relevant consideration is where the acts and omissions underlying plaintiffs' claims occurred.

claim in this case would be decided under California law.[2]  The Southern District of Texas routinely applies Texas tort law in FTCA and diversity cases; this Court seldom if ever does.  Familiarity with the governing law therefore weighs in favor of transfer.  *Cf. Hansen v. Combined Transp., Inc.*, No. 13-cv-1298, 2013 WL 5969863, at *2 (W.D. Wash. Nov. 7, 2013) ("because plaintiff brings more claims under Oregon law than Washington law, this factor favors transfer to Oregon"); *Barroca*, 2019 WL 5722383, at *2 (second factor favored the District of Kansas because "the majority of the causes of action alleged in the complaint will be decided under Kansas law, and, consequently, the District of Kansas is likely the district 'most familiar with the governing law.'").

c.     **The Convenience and Interests of the Parties Favor Transfer.**

Factors four ("respective parties' contacts with the forum") and eight ("ease of access to sources of proof") weigh in favor of transfer.  "When evaluating the extent of the parties' contacts with the chosen venue, courts consider a number of factors including: (i) whether plaintiff . . .  reside[s] in the district; (ii) whether plaintiff's claims arise within the district; and (iii) whether plaintiff's claims are based on the state law of the chosen district."  *Martinez v. Knight Transportation, Inc.*, No. 1:16-cv-1730, 2017 WL 2722015, at *4 (E.D. Cal. June 23, 2017)  (Drozd, J.).  "The convenience of witnesses is often the most important factor in resolving a motion to transfer venue." *Pizana v. SanMedica Int'l LLC*, No. 1:18-cv-644, 2020 WL 469336, at *4 (E.D. Cal. Jan. 29, 2020) (Drozd, J.).

Though plaintiffs reside in this district, most of their claims arise in the Southern District of Texas and are governed by Texas law.  In addition, plaintiffs' contacts with the Southern District of Texas are substantial—that is where they entered the United States; where they were apprehended, initially held in custody, and separated; where AFP entered his guilty plea; and where the Complaint alleges plaintiffs suffered the most egregious wrongs.  Consequently, the Southern District of Texas is also the most convenient forum for most witnesses, as it is where most potential witnesses with relevant knowledge live and work.

For example, plaintiffs' abuse-of-process claim may require rebuttal testimony from multiple witnesses in Texas.  Improper purpose is an essential element of this claim.  *See, e.g., Cooper v. Trent*,

---

[2] Plaintiffs' fourth and final claim (negligence while JFC was in the care and custody of ORR in New York) would be decided under New York law.

551 S.W.3d 325, 333–34 (Tex. App. 2018).  On this element, the Complaint alleges that AFP's criminal prosecution must have been a pretext for family separation because he was only sentenced to time served.  ECF No. 1 ¶¶ 33-37.  Border Patrol Agents Mickel Gonzalez and Juan de la Cruz may be called in rebuttal to explain the legitimate purposes for the prosecution.   De la Cruz interviewed AFP at the RGV Processing Center and referred his case for criminal prosecution based on AFP's admission that he illegally entered the United States and due to his recidivist history of illegally entering the United States on three prior occasions, each time resulting in his removal.  Declaration of Juan de la Cruz ¶¶ 3-4.  After reviewing the referral and confirming that it supported the proposed charge, Gonzalez drafted and signed the criminal complaint and filed it with the court.  Declaration of Mickel Gonzalez ¶¶  3-4

Still more witnesses may be needed to rebut plaintiffs' allegations that AFP was subjected to "inhumane conditions" at the Rio Grande Detention Facility in Laredo, and that while held there, he was forced to waive his asylum claim by "emotional abuse and manipulation" from detention officers and by trickery of a notary public who pretended to be a lawyer.  ECF No. 1 ¶¶ 41-52.  Rebuttal witnesses for this claim cannot be identified at this time, because the Complaint does not name the alleged wrongdoers and discovery has not opened.  Nonetheless, such witnesses are likely to be in or near Laredo, in the Southern District of Texas, where plaintiffs allege this misconduct occurred.  *See id*. ¶ 41.

To put all this more generally, at least 18 potential rebuttal witnesses who were involved in plaintiffs' apprehension, initial custody, criminal prosecution, and removal currently have duty stations in the Southern District of Texas.  *See* Hastings Decl. ¶ 17.  To our knowledge, no potential rebuttal witnesses are in or near this District.

Factor five ("contacts relating to the plaintiff's cause of action in the chosen forum") also favors transfer because, simply put, there are no such contacts.  The sole contact with this District referred to in the Complaint is that plaintiffs reside here.  ECF No. 1 ¶ 18.  Their residence is not "relate[d] to the plaintiffs' cause of action" and therefore is irrelevant to factor five.

Factor six ("differences in cost of litigating in the two forums") also favors transfer.  It would cost much more to litigate this case in the Eastern District of California than it would in the Southern District of Texas.  If the case proceeds beyond a motion to dismiss, a substantial amount of discovery will concern conditions and events in the RGV Processing Center in McAllen and the Rio Grande

Detention Center in Laredo, and perhaps also the Port Isabel Processing Center in Los Fresnos—all of which are in the Southern District of Texas.  Numerous employees of CBP, ICE, and a contractor that runs the detention center in Laredo are likely to be deposed in Texas, requiring extensive travel by counsel.  For the government at least, travel expenses for discovery in Texas would not be required if the case is transferred.  In addition, if the case proceeds to trial, numerous witnesses from Texas will be required to testify on conditions of custody, separations, and events that occurred in those facilities, imposing major additional travel expenses.  *See, e.g.,* Hastings Decl. ¶¶ 17-18 (California trial testimony would require travel from Texas by as many as 18 Border Patrol agents, removing each from their law enforcement duties for three days or more).  Unless plaintiffs intend to rely solely on their own testimony, travel expenses for trial witnesses will burden all parties.  Conducting site visits, meeting with witnesses, flying back and forth between government counsel's office in Sacramento and Texas while accommodating witness, site, and attorney time would multiply these costs, which could be avoided or dramatically reduced by transferring this action to the district where the events occurred.  *Cf. Nordquist v. Blackham*, No. C06-5433 FDB, 2006 WL 2597931, at *4 (W.D. Wash. Sept. 11, 2006) ("Generally, litigation costs are reduced when venue is located near most of the witnesses expected to testify or be deposed . . .  Here, all potential witnesses and parties, save one, reside in northern Texas. Accordingly, this factor favors transfer."); *Park v. Dole Fresh Vegetables, Inc*., 964 F. Supp. 2d 1088, 1095 (N.D. Cal. 2013) ("Generally, litigation costs are reduced when venue is located near the most witnesses expected to testify").

Factor seven ("the availability of compulsory process") also weighs in favor of transfer. Witnesses in Texas are beyond the subpoena power of this Court.  This could preclude the United States from calling critical rebuttal witnesses at a trial to address the allegations related to the Rio Grande Detention Center in Laredo.  That facility is operated by a contractor, GEO Group, and thus the guards and other personnel who operate it are primarily GEO Group employees—not government employees who could be directed to attend a trial here.  *See* Brewster Decl. ¶¶  2, 11.

### d. Plaintiffs' Choice of Forum Should Be Given Little Weight.

The only factor that favors maintaining this action in this District is factor three, plaintiffs' choice of forum; but in the circumstances here, it should carry little weight.  Deference to a plaintiff's

chosen venue is substantially reduced where that locale lacks any real connection to the activities alleged in the complaint.  *See, e.g.*, *Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1260 (W.D. Wash. 2005); *Hansen*, 2013 WL 5969863, at *2; *Nordquist*, 2006 WL 2597931, at *4 ("A plaintiff's choice of forum is given much less weight when the forum lacks any significant contact with the activities alleged in the complaint.  As previously noted, the business is located in Texas, the Defendants reside in Texas, and the Plaintiff resided in Texas while operating the business and during significant negotiations of the sale.  This factor weighs heavily in favor of transfer.").  This forum has no connection to any activity alleged in the Complaint.  The Complaint alleges no misconduct in this District, and no relevant events occurred here.

The actual increased burden on plaintiffs prior to trial if the case is transferred would likely be minimal.  None of their counsel are located within hundreds of miles of this Court, and nearly all discovery will be conducted in Texas and New York whether the case is transferred or not.  By contrast, the inconvenience to defendant of litigating this case across the country from where the events occurred would be substantial.

e.      **The Interests of Justice Favor Transfer.**

The public-interest factors governing transfer include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a [case governed by state law] in a forum that is at home with the law." Atl. Marine Const. Co., 571 U.S. 49, 62 n.6.  The applicability of Texas tort law is discussed above.  The other public-interest factors also weigh in favor of transfer.

First, this District is burdened with a major "caseload crisis."[3]  Congress has not expanded the Court's bench in the last 44 years, while the district population grew 220 percent during the same period.[4]  As explained in the Standing Order entered in this case last May (ECF No. 4-2), the resulting mismatch of caseload and judgeships has led to an "Ongoing Judicial Emergency":

> The judges of the United States District Court for the Eastern District of
> California have long labored under one of the heaviest caseloads in the

[3] Judges of E.D. Cal., *Letter to Congress Regarding Our Caseload Crisis*, available at
https://www.caed.uscourts.gov/caednew/assets/File/Judgeship%20Letter%20June%202018.pdf

[4] *Id.*

UNITED STATES' MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF MOTION TO TRANSFER

1

2
> nation even when operating with a full complement of six authorized
> District Judges.  Each of those six District Judges has regularly carried a
> caseload double the nationwide average caseload for District Judges.

3    *Id*. at 1, 2.  Because its caseload is unmanageable in these circumstances, this Court currently ranks 73rd

4    among the 94 federal district courts for the percentage of civil cases pending more than three years and

5    91st for the average time to close criminal cases.[5]  Thus, court congestion "seriously hinder[s] the

6    administration of justice throughout this district."  Standing Order, *supra* at 2.  This crisis would

7    adversely affect plaintiffs as well as the government if the case is not transferred.

8        The Southern District of Texas has a comparatively lighter caseload.  During the year ending last

9    September 30 (the most recent statistics available), the "caseload per judgeship" in the Southern District

10   of Texas (784) was less than 60 percent as high as in this District (1322).[6]  And during the same period,

11   less than half as many new civil cases per judgeship were filed there (313) as here (701).[7]  Thus, as this

12   Court found in *Martinez v. Knight Transportation, Inc*., No. 1:16-cv-1730, 2017 WL 2722015 (E.D. Cal.

13   June 23, 2017) (Drozd, J.), court congestion "weighs in favor of transfer[.]"  *Id.* at *8.

14       Second, the Southern District of Texas has a substantial local interest in this case.  Plaintiffs'

15   claims focus primarily on alleged misconduct of government agents operating in the Southern District of

16   Texas and conditions of confinement in immigration facilities there.  The Southern District of Texas has

17   the greater interest in keeping people in that District safe from government wrongdoing.  *See, e.g.,*

18   *Canal A Media Holding, LLC v. United States Citizenship & Immigration Servs.*, No. 17-cv-6491, 2018

19   WL 7297829, at *4 (C.D. Cal. Sept. 30, 2018) (finding that the transferee district "has a great interest in

20   protecting its citizens from the unreasonable actions of a government agency" (punctuation omitted)).

21       In addition, the Southern District of Texas has a compelling interest in ensuring the integrity of

22   its own proceedings, which the Complaint places in issue by alleging that the district court there

23   conducted a "charade of a court hearing" when it accepted AFP's guilty plea without affording him

24   counsel and an interpreter—both of which the court's official record says he had.  *See supra* at 6.  Given

25

26       [5] Administrative Office of U.S. Courts, *U.S. District Court — Judicial Caseload Profile*,
     available at www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2021.pdf.

27       [6] *Id*.

28       [7] *Id*.

these extraordinary allegations, the interests of justice weigh heavily in favor of transfer.

### V.        <u>CONCLUSION</u>

For the foregoing reasons, this action should be transferred to the Southern District of Texas (McAllen Division).

Dated:  February 15, 2022                    Respectfully submitted,

PHILLIP A. TALBERT
United States Attorney

By: _____
DAVID T. SHELLEDY
Civil Division Chief
VICTORIA L. BOESCH
Assistant U.S. Attorney