1
2
3
4
5
6
7
8                            UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    A.F.P. and J.F.C.,                        No.  1:21-cv-00780-DAD-EPG

12              Plaintiffs,

13        v.                                     ORDER DENYING DEFENDANT'S
                                                 MOTION TO TRANSFER VENUE AND
14    UNITED STATES OF AMERICA,                  MOTION TO DISMISS

15              Defendant.                       (Doc. Nos. 15, 22)

16

17

18           This matter is before the court on defendant United States of America's motion to transfer

19    this action to the United States District Court for the Southern District of Texas (McAllen

20    Division) (Doc. No. 15) and defendant's motion to dismiss under Federal Rule of Civil Procedure

21    12(b)(1) for lack of subject matter jurisdiction (Doc. No. 22).  Pursuant to General Order No. 617

22    addressing the public health emergency posed by the COVID-19 pandemic, defendant's motions

23    were taken under submission on the papers.  (Doc. Nos. 16, 23.)  Having considered the parties'

24    briefs, and for the reasons stated below, the court will deny the government's motion to transfer

25    venue and grant in part and deny in part the government's motion to dismiss.

26                                    **BACKGROUND**

27           In this Federal Torts Claims Act ("FTCA") case, plaintiffs seek damages for injuries

28    allegedly sustained at the hands of the federal government, through the actions and policies of

                                              1

Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE") officers, when plaintiffs entered the United States seeking asylum and were forcibly separated for fifteen months.

**A.      Factual Background**

Plaintiff A.F.P. and his son, J.F.C., are citizens of Honduras.  (Doc. No. 1, Compl. ¶¶ 16–17.)  On or about January 29, 2018, A.F.P. and J.F.C., who was a fifteen-year old minor at the time, fled Honduras for the United States, entering the country near McAllen, Texas to seek asylum from persecution.  (*Id.* at 16–18, 20–23.)  Plaintiffs voluntarily approached CBP agents to seek asylum, but CBP agents apprehended them, stripped them of their belongings, and detained them separately for two days at a CBP facility described by plaintiffs as a "*hielera*" or "ice box" due to its cold temperatures.  (*Id.* at ¶¶ 24–25.)  Immigration officers forcibly separated A.F.P. and J.F.C. after their arrival at the *hielera* and only permitted plaintiffs to speak to each other for thirty minutes each day.  (*Id.* at ¶ 25.)  On the third day, A.F.P was charged in the Southern District of Texas with illegal entry in violation of 8 U.S.C. § 1325, entered a guilty plea to that charge, and was sentenced to time served.  (*Id.* at ¶ 34.)  Plaintiff A.F.P. alleges he was not provided with an attorney, an interpreter, a chance to explain his asylum claim, or given any legal information about the charges against him.  (*Id.* at ¶ 26.)  The court record reflects that plaintiff A.F.P. was represented by the Office of the Federal Public Defender in that district, assisted by an interpreter, was advised of and waived his rights, and that the court found that his guilty plea was freely and voluntarily made and was supported by a factual basis.  (Doc. No. 22-2, Exh. C.)

During A.F.P.'s court hearing on his illegal entry charge, CBP and ICE officers designated J.F.C. as an unaccompanied minor, transferred J.F.C.'s custody to the Office of Refugee Resettlement (ORR), and transferred J.F.C. to a facility in New York, operated by government contractor Children's Village Shelter, without providing the transfer destination or a reason for J.F.C.'s transfer to either A.F.P. or J.F.C.  (Compl. ¶¶ 26–27, 34–35; Doc. No. 22-2, Exh. D, Declaration of James De La Cruz ¶ 4.)  Seven months later, plaintiff J.F.C. was placed in the custody of a foster family in New York.  (De La Cruz Decl. ¶¶ 4–5.)  Plaintiffs did not see each other again for fifteen months. (Compl. ¶ 28.)  During that time, the federal government

provided only limited information to plaintiff A.F.P. about J.F.C. and afforded only minimal opportunities for communication between the two.  (*Id.* at ¶¶ 42, 46, 57–58.)  Plaintiffs allege that they suffered, and continue to suffer, substantial trauma as a result of this separation.  (*Id.* at ¶¶ 70, 74.)

A.F.P. alleges that he was mistreated by CBP and ICE officers through the duration of his time in custody.  Specifically, he alleges that immigration officers (1) placed him in cold, cramped, dirty, and uncomfortable conditions; (2) provided him with insufficient food and water, and that the little food provided was frozen and expired; (3) deprived him of contact with J.F.C. while telling A.F.P. that he would be deported without his son, threatening a permanent separation.  (*Id.* at ¶¶ 38–40.)  A.F.P. was subsequently transferred to Port Isabel, Texas, and then to the Rio Grande Detention Facility in Laredo, Texas.  (*Id.* at ¶ 41.)  He was not allowed to communicate with J.F.C. until two days after his transfer to that facility.  (*Id.* at ¶ 42.)  A.F.P. alleges that detention officers subjected him to further mistreatment, including crowded conditions, inadequate restrooms, and insufficient water and food.  (*Id.* at ¶¶ 43–44.)  A.F.P. did not receive information about his asylum claim for thirty days and was denied communication with J.F.C. for twenty-two days until he began a hunger strike.  (*Id.* at ¶¶ 45–46.)  On the third day of the hunger strike, A.F.P. was placed in solitary confinement and allowed to speak to J.F.C. on the telephone for a few minutes.  (*Id.* at ¶ 46.)

During an interview with A.F.P, an asylum officer told plaintiff that he had a credible asylum case.  (*Id.* at ¶ 48.)  At the Rio Grande detention center, officers took A.F.P. to a notary public that they referred to as a "lawyer" when A.F.P. asked to speak to someone about his case.  (*Id.* at ¶ 49.)  The notary public told A.F.P. that he was going to be deported and that it would take five or six months to be released from the detention center.  (*Id.* at ¶ 50.)  At a subsequent removal hearing, the judge declared A.F.P. ineligible for release on bond.  (*Id.* at ¶ 51.)  A.F.P., confused by the information provided by the notary public, believed his only choices where to withdraw his asylum application or maintain his application while remaining separated from plaintiff J.F.C. for many months and, as a result, withdrew his asylum application at the hearing.  (*Id.*)  Plaintiffs allege that A.F.P. was never offered an attorney and that no one explained to him

the consequences of withdrawing his asylum application.  (*Id.* at ¶ 52.)  A.F.P. was subsequently transferred to maximum-security prisons in Ohio and Louisiana, where he suffered mistreatment including being provided insufficient food and being denied the use of bathrooms to urinate, before he was finally deported a month after his removal hearing.  (*Id.* at ¶¶ 53–55.)

Plaintiff J.F.C. also alleges that he suffered physical and emotional abuse during his detention.  Specifically, plaintiff J.F.C. alleges that, at the *hielera*, he was given rancid food, deprived of contact with his father, removed to New York without any explanation as to where or why he was being transferred.  (*Id.* at ¶¶ 59–61.)  Once transferred to the Children's Village facility in New York, plaintiff J.F.C. alleges that he was forced to drink water from the sink, lived in crowded conditions, was subject to emotional abuse and denied communication with his father.  (*Id.* at ¶¶ 64–68.)  While in the custody of Children's Village, J.F.C. went to a local indoor swimming pool, slipped, fell, and injured his ear.  (*Id.* at ¶ 72.)  Children's Village staff did not seek treatment for J.F.C. despite plaintiff making multiple reports of pain.  (*Id.*)  J.F.C. suffered from an ear infection and continues to suffer hearing loss as a result.  (*Id.*)  J.F.C. alleges the separation, lack of contact with his father, and the emotional abuse has caused him physical, emotional, and psychological trauma, including severe memory problems as a result of repressing his experience in New York.  (*Id.* at ¶¶ 69–71.)

In February 2019, A.F.P. and his family, with the help of a U.S.-based human rights organization, lawfully re-entered the United States.  (*Id.* at ¶ 57.)  J.F.C. was reunited with A.F.P. and his family a week later, after nearly fifteen months of separation.  (*Id.* at ¶ 58.)

**B.   Procedural Background**

Plaintiffs filed suit on May 14, 2021, asserting four claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671–80:  (1) intentional infliction of emotional distress ("IIED"); (2) abuse of process; (3) negligence as to family separation; and (4) negligence as to plaintiff J.F.C.'s time in ORR custody.  (Compl. ¶¶ 82–101.)  Plaintiffs seek compensatory damages.

/////

/////

4

1    The government filed a motion to transfer venue to the Southern District of Texas on

2    February 15, 2022.  (Doc. No. 15.)  Plaintiffs filed their opposition on March 1, 2022, and the

3    government filed a reply on March 8, 2022.  (Doc. Nos. 18, 21.)

4        On March 14, 2022, the government filed a motion to dismiss this action for lack of

5    subject matter jurisdiction.  (Doc. No. 22-1.)  Plaintiffs filed their opposition brief on March 28,

6    2022, and the government filed their reply thereto on April 7, 2022.  (Doc. Nos. 24, 25.)

7                                    **LEGAL STANDARD**

8    **A.       Motion to Transfer Venue**

9        Pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other

10   district or division where it might have been brought" for the convenience of parties and

11   witnesses and in the interest of justice.  "[T]he purpose of [§ 1404(a)] is to prevent the waste of

12   time, energy and money and to protect litigants, witnesses and the public against unnecessary

13   inconvenience and expense."  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal

14   quotation marks and citation omitted).  "Section 1404(a) is intended to place discretion in the

15   district court to adjudicate motions for transfer according to an 'individualized, case-by-case

16   consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29

17   (1988) (quoting *Van Dusen*, 376 U.S. at 622).

18       District courts employ a two-step analysis when determining whether to transfer an action.

19   *Robert Bosch Healthcare Sys., Inc. v. Cardiocom, LLC*, No. 3:14-cv-01575-EMC, 2014 WL

20   2702894, at *3 (N.D. Cal. June 13, 2014).  "A court must first consider the threshold question of

21   whether the case could have been brought in the forum to which the moving party seeks to

22   transfer the case."  *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1093 (N.D. Cal.

23   2013); *see also Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985) ("In determining

24   whether an action 'might have been brought' in a district, the court looks to whether the action

25   initially could have been commenced in that district.")  "Once the party seeking transfer has made

26   this showing, district courts have discretion to consider motions to change venue based on an

27   'individualized, case-by-case consideration of convenience and fairness.'"  *Park*, 964 F. Supp. 2d

28   at 1093 (quoting *Stewart Org.*, 487 U.S. at 29).  In addition, "Section 1404(a) provides for

                                            5

1    transfer to a more convenient forum, not to a forum likely to prove equally convenient or

2    inconvenient." *Mainstay Bus. Sols. v. Indus. Staffing Servs.*, No. 2:10-cv-03344-KJM-GGH,

3    2012 WL 44643, at *1 (E.D. Cal. Jan 9, 2012) (citing *Van Dusen*, 376 U.S. at 645–46).  The

4    burden is on the moving party to show that transfer is appropriate.  *Commodity Futures Trading*

5    *Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979.)

6         "A motion to transfer venue under § 1404(a) requires the court to weigh multiple factors

7    in its determination whether transfer is appropriate in a particular case."  *Jones v. GNC*

8    *Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).  These factors include:

> (1) the location where the relevant agreements were negotiated and
> executed, (2) the state that is most familiar with the governing law,
> (3) the plaintiff's choice of forum, (4) the respective parties' contacts
> with the forum, (5) the contacts relating to the plaintiff's cause of
> action in the chosen forum, (6) the differences in the costs of
> litigation in the two forums, (7) the availability of compulsory
> process to compel attendance of unwilling non-party witnesses, and
> (8) the ease of access to sources of proof.

14   *Id.* at 489–99.  Moreover, while "§ 1404(a) transfers are different than dismissals on the ground

15   of *forum non conveniens*," *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253 (1981), the Ninth

16   Circuit has found that "*forum non conveniens* considerations are helpful in deciding a § 1404

17   transfer motion," *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir.

18   1986), *superseded by statute on other grounds by* 28 U.S.C. § 1391.  Accordingly, a district court

19   can consider private and public factors affecting the convenience of the forum.  *Id.*  The private

20   factors include "the 'relative ease of access to sources of proof; availability of compulsory

21   process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;

22   possibility of view of premises, if view would be appropriate to the action; and all other practical

23   problems that make trial of a case easy, expeditious and inexpensive.'"  *Id.* (quoting *Gulf Oil*

24   *Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  The public factors include "the administrative

25   difficulties flowing from court congestion; the 'local interest in having localized controversies

26   decided at home'; the interest in having the trial of a diversity case in a forum that is at home with

27   the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or

28   in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum

with jury duty." *Id.* (quoting *Piper Aircraft Co.*, 454 U.S. at 241, and *Gulf Oil Corp.*, 330 U.S. at 509).

**B.      Motion to Dismiss Pursuant to Rule 12(b)(1)**

A party may move to dismiss a case for a lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Because of this, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (internal citations omitted).

Challenges to jurisdiction may be either facial or factual in nature. *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1167 (E.D. Cal. 2012).  A facial attack to jurisdiction "accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  On the other hand, a factual attack "contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.*  In a factual challenge, the court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *see also Friends of the Earth v. Sanderson Farms, Inc.,* 992 F.3d 939, 944-45 (9th Cir. 2021); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

## ANALYSIS

Below, the court will first address defendant's motion to transfer venue (Doc. No. 16).  Because the court concludes that the government has not demonstrated that a transfer would promote the convenience of parties and witnesses or would be in the interests of justice for the reasons discussed below, the court will then turn to address the merits of defendant's motion to dismiss (Doc. No. 22).

/////

/////

1    **A.    Motion to Transfer Venue**

2         Defendant moves to transfer this case to the U.S. District Court for the Southern District

3    of Texas (Doc. No. 16), which plaintiffs do not dispute is a viable forum for this action (*see* Doc.

4    No. 18).  Defendant does not dispute that venue in the Eastern District of California is proper.

5    (*See* Doc. No. 16.)  Rather, the parties focus on how the relevant factors should be considered and

6    balanced in this case.  Accordingly, the court will focus on the convenience and fairness inquiry.

7    *See Jones*, 211 F.3d at 498–99; *Decker Coal Co.*, 805 F.2d at 843 (internal citations omitted).

8              1.    Private Interest Factors

9                   a.    *Parties' Choice of Forum*

10        In general, courts considering motions for change of venue give significant deference to a

11   plaintiff's choice of forum.  *See Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).

12   "[C]onsiderable deference" is given when a plaintiff chooses his home forum."  *Glob.*

13   *Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1112 (9th

14   Cir. 2020); *see also Adidas Am., Inc. v. Cougar Sport, Inc.*, 169 F. Supp. 3d 1079, 1096 (D. Or.

15   2016) ("[a] plaintiff's choice of forum is especially given deference where the plaintiff is a

16   resident of the forum in which the action is brought").  Here, plaintiffs chose to commence this

17   action in their home district. (Doc. No. 18 at 9.)

18        The government favors the Southern District of Texas.  As defendant correctly contends, a

19   plaintiff's forum choice is given substantially less weight when the central dispute in the action

20   occurred primarily in another forum and lacks any significant contact with the forum. *See, e.g.,*

21   *Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1260 (W.D. Wash. 2005).  Here, the

22   alleged tortious conduct took place while plaintiffs were in the government's custody in Texas

23   and, in plaintiff J.F.C.'s case, New York.

24        Because there are only limited material connections between the events underlying this

25   action and the Eastern District of California, plaintiffs' choice of forum is therefore to be

26   accorded diminished weight.

27   /////

28   /////

               **b.**      *Whether the Claim Arose Elsewhere*

       Nearly all the facts at issue in this case arose in Texas.  Plaintiffs were apprehended and detained there after entering the United States near McAllen, Texas, through a section of the United States and Mexican border located in the Southern District of Texas.  (Compl. ¶¶ 24–27, 38–52.)  Some of the facts involving the alleged neglect and psychological trauma of plaintiff J.F.C. arose in New York, where he was transferred to after his initial detention in Texas.  (*Id.* at ¶¶ 62–73.)  On balance, because the alleged tortious conduct occurred outside of California, this factor favors transfer.

               **c.**      *Convenience of the Parties and Relative Means of the Parties*

       Transfer is not appropriate when it merely shifts the burden of litigating in a distant or otherwise disfavored forum from the defendant to the plaintiff.  *See Mitchell v. 1Force Gov't Sols., LLC*, No. 2:18-cv-07612-PSG-SK, 2018 WL 6977476, at \*4 (C.D. Cal. Nov. 29, 2018) (internal citation omitted).

       The government argues that because many of its witnesses are located in Texas, litigating this action in the Eastern District of California would be much more expensive.  (Doc. No. 15 at 19.)  The government contends that travel for government witnesses from Texas to California would incur "major travel expenses" and that necessary discovery would also incur significant travel expenses for both the government and plaintiffs' counsel.  (*Id.*)  Defendant contends that convenience of the parties favors transfer because "[f]or the government at least, travel expenses for discovery in Texas would not be required if the case is transferred."  (*Id.*)  Plaintiffs argue that they face far greater burdens if they were forced to litigate this action in Texas, contending that "maintaining a lawsuit in virtually any other district (especially one 1,500 miles away) likely would be impossible for them."  (Doc. No. 18 at 10.)  Plaintiffs explain that the transfer of this action would cause them severe financial hardship, noting that they are seasonal agricultural workers with highly variable hours, who can neither afford the costs of traveling to Texas for litigation nor afford the time away from work.  (*Id.* at 10–11.)  Plaintiffs explain that nearly all of their wages are spent on necessities and that they "have virtually no savings."  (*See* Doc. Nos. 18-1, Declaration of A.F.P., ¶¶ 7–8; 18-2, Declaration of J.F.C., ¶¶ 7–8.)

Plaintiffs' financial situation, already tenuous given the seasonal nature of their work, would make it burdensome for them to travel to and litigate in Texas.  (*See* Doc. Nos. 18-1, A.F.P. Decl., ¶¶ 6–9; 18-2, J.F.C. Decl., ¶¶ 6–9.)  Transferring this action to the Southern District of Texas would merely shift the burden from the government to plaintiffs of limited means. Under these circumstances of significant disparity between the means of the parties, "[p]laintiff[s'] choice of venue should be left undisturbed." *Flores v. United States*, 142 F. Supp. 3d 279, 288 (E.D.N.Y. 2015) (internal quotation and citation omitted); *Pizana v. SanMedica Int'l LLC*, No. 1:18-cv-00644-DAD-SKO, 2020 WL 469336 at *4 (E.D. Cal. Jan. 29, 2020) (courts must "be careful to avoid a transfer that 'would merely shift rather than eliminate' the inconvenience of costs . . . .") (internal citation omitted).

Because plaintiffs reside in California and would experience significant hardship if they were to litigate this case in Texas, the convenience of parties and the relative means of the parties weigh strongly against transfer.

        d.    *Convenience of the Witnesses and Availability of Compulsory Process*

The convenience of the witnesses is often the paramount factor in ruling on a motion to transfer under § 1404(a).  *See Ironworkers Local Union No. 68 & Participating Employers Health & Welfare Fund v. Amgen, Inc.*, No. 2:07-cv-05157-PSG-AGR, 2008 WL 312309, *5 (C.D. Cal. Jan. 22, 2008).  "Importantly, while the convenience of party witnesses is a factor to be considered, the convenience of non-party witnesses is the more important factor." *Id.* (citing *Saleh v. Titan Corp.*, 361 F. Supp. 2d 1152, 1160 (S.D. Cal. 2005)).  Likewise, the convenience of an employee of the party seeking transfer is "entitled to little weight" because "[d]efendants will be able to compel [the employee's] testimony at trial." *See Jaco Env't. Inc. v. Appliance Recycling Centers of Am., Inc.*, No. 3:06-cv-06601-JSW, 2007 WL 951274, at *4 (N.D. Cal. Mar. 27, 2007).  To show inconvenience for witnesses, "the moving party should state the witnesses' identities, locations, and content and relevance of their testimony." *Meyer Mfg. Co. Ltd. v. Telebrands Corp.*, No. 2:11-cv-03153-LKK-DAD, 2012 WL 1189765, at *6 (E.D. Cal. Apr. 9, 2012) (citing *Florens Container v. Cho Yang Shipping*, 245 F. Supp. 2d 1086, 1092–93 (N.D. Cal. 2002)); *see also E. & J. Gallo Winery v. F. & P. S.p.A.*, 899 F. Supp. 465, 466 (E.D. Cal.

1  1994) ("[a]ffidavits or declarations are required to identify key witnesses and a generalized

2  statement of their anticipated testimony").

3        Defendant argues that transfer of this action to the Southern District of Texas would be

4  proper because "most potential witnesses with relevant knowledge," including "at least 18

5  potential rebuttal witnesses" are based in Texas and none are based in California.  (Doc. No. 15 at

6  16–19.)  The government also argues some of its witnesses are employed by a private government

7  contractor, GEO Group, and thus are not government employees who may be compelled to testify

8  and are beyond the subpoena power of this court.  (*Id.* at 20.)

9        In opposition, plaintiffs do not dispute that many of the witnesses that are likely to be

10  called to testify in this case are based in Texas.  (Doc. No. 18 at 12.)  However, plaintiffs contend

11  that should not be dispositive of the pending motion because many of the (unidentified at this

12  point) Texas-based witnesses are government employees who may be compelled to testify in

13  California.  (*Id.*)  Plaintiffs also argue that other witnesses are located in other states, including

14  plaintiffs themselves and their family members in California, individuals in New York who

15  observed plaintiff J.F.C.'s treatment while he was separated from his father, and government

16  officials in Washington, D.C. who created and directed the family separation policy.  (*Id.* at 12–

17  13.)  Plaintiffs contend that a transfer of this case would merely shift the burden of the

18  inconvenience of the witnesses from defendant to plaintiffs and that such burden-shifting "would

19  be particularly egregious given [p]laintiffs' lack of resources to pursue their claims in a

20  courthouse 1,500 miles away."  (*Id.* at 13.)  Additionally, plaintiffs argue that the lack of

21  compulsory process is irrelevant because the government "does not claim that it cannot control its

22  contractors" and has not specifically identified witnesses, third-party contractors or otherwise,

23  who have refused to testify at the trial of this action.  (*Id.* at 15.)

24        Defendant reiterates in its reply that because the Laredo detention facility where plaintiff

25  A.F.P. was detained is operated by a private contractor and not the government, the contractor

26  "employees can neither be directed nor subpoenaed to testify at a trial in this district."  (Doc. No.

27  21 at 13.)  The government also contends that the identification of specific witnesses at this point

28  is not required and cannot occur prior to the completion of discovery in this litigation.  (*Id.*)

1    The court finds plaintiffs' arguments to be persuasive.  Although the government correctly

2    notes that the complaint alleges wrongdoing by Laredo detention facility employees (*see* Compl.

3    ¶¶ 41–52), the complaint also alleges wrongdoing by ICE and CPB officials (*see, e.g.*, *id.* at

4    ¶¶ 34–41, 48, 51).  As federal employees, these witnesses may be compelled to testify in this

5    court by the government, and any inconvenience to them may be discounted.  *See Getz v. Boeing*

6    *Co.*, 547 F. Supp. 2d 1080, 1084 (N.D. Cal. 2008) (holding that courts "discount[] any

7    inconvenience to the parties' employees, whom the parties can compel to testify.").  With respect

8    to non-party witnesses such as government contractors, the parties "can utilize videotaped

9    depositions in lieu of live testimony, or arrange for live testimony by video, lessening the burden

10   on the witnesses." *Flores*, 142 F. Supp. 3d at 288 (citing *JetBlue Airways Corp. v. Helferich*

11   *Patent Licensing, LLC*, 960 F. Supp. 2d 383, 399 (E.D.N.Y. 2013)).  Furthermore, as plaintiffs

12   have noted, plaintiffs themselves will need to be present and will almost certainly testify, and

13   plaintiffs have submitted declarations describing both the financial and mental health hardships

14   they would suffer should this action be transferred to the Southern District of Texas.  (Doc. Nos.

15   18 at 12–13; 18-1, A.F.P. Decl., ¶¶ 5–9; 18-2, J.F.C. Decl., ¶¶ 5–9.)  "It would be inappropriate to

16   shift the burden to [plaintiffs] and force [them] to choose between traveling to Texas at the

17   expense of [their] health or appearing at [their] trial by video." *Flores*, 142 F. Supp. at 288.

18       Accordingly, the court concludes that consideration of witness convenience and the

19   availability of compulsory process does not weigh in favor of transferring venue.

20           e.     *Location of Books and Records*

21       The government contends that consideration of this factor favors transfer because the

22   custodial facilities of the records needed for the presentation of this action are located in Texas.

23   (Doc. No. 21 at 13.)  However, as plaintiffs point out, the location of books and records is also

24   not decisive to resolution of the pending motion because documentary evidence related to this

25   case can be reproduced and transmitted electronically to this court.  (*See* Doc. No. 18 at 15;

26   *Williams v. Robert Half Int'l Inc.*, No. 4:20-cv-03989-KAW, 2020 WL 12655622, at *3 (N.D.

27   Cal. Sept. 18, 2020) ("in the digital age, the access to records is neutral given the portability of

28   documents.").

Accordingly, the court concludes that consideration of this factor is neutral as to transfer of this case.

### 2.   Public Interest Factors

#### a.   *Courts' Familiarity with Controlling Case Law*

Plaintiffs' complaint asserts causes of action for intentional infliction of emotional distress, abuse of process, and negligence.  (Compl. ¶¶ 82–101.)  Plaintiffs do not dispute that three of their tort claims are governed by Texas law and their last claim by New York law.  (Doc. Nos. 15 at 11; 18 at 15.)

The government argues that the U.S. District Court for the Southern District of Texas is more familiar with Texas state law and "routinely applies Texas tort law in FTCA and diversity cases[.]"  (Doc. No. 15 at 18.)   Plaintiffs counter that their suit is neither a complex class action nor a multi-district litigation action such that this court would find difficulty applying Texas law.  (Doc. No. 18 at 15.)

The court observes that plaintiffs' state law tort claims, which sound in common law negligence, are not complex.  "Federal courts are deemed capable of applying the law of other states."  *Certain Underwriters at Lloyd's London v. National R.R. Passenger Corp.*, No. 1:14-cv-04717-FB-RLM, 2015 WL 1182764, at *4 (E.D.N.Y. Mar. 13, 2015).  This court can certainly ascertain Texas law with the assistance of counsel.

The court concludes that consideration of this factor, knowledge of the applicable law, weighs only slightly in favor of transfer.

#### b.   *Court Congestion, Local Interests, and Public Policies*

The government argues that judicial efficiency calls for transfer to the Southern District of Texas, which has a comparatively lighter caseload than this district.  (Doc. No. 15 at 21–22.)  The government also contends that the Southern District of Texas has a substantial local interest in this case because plaintiffs' claims focus on the conduct of government agents who work in that district and the conditions of confinement in immigration facilities located in Texas.  (Doc. No. 15 at 22.)  Defendant also argues that consideration of local interests favor transfer and that the Southern District of Texas has a "compelling interest in in ensuring the integrity of its own

1   proceedings" because plaintiffs challenge the legitimacy of plaintiff A.F.P.'s guilty plea accepted

2   by that court.  (*Id.* at 22–23.)

3         Plaintiffs contend that even if considerations relating to judicial efficiency were to weigh

4   in favor of transfer, transfer of this action to the Southern District of Texas would impede the

5   public's interest in preserving access to the courts because plaintiffs would be effectively

6   "prohibit[ed] . . . from litigating this case to trial."  (Doc. No. 18 at 15.)  Regarding the

7   government's argument as to the local interests at issue in this case, plaintiffs argue that "[i]t is

8   difficult to avoid the implication that the government believes the Southern District of Texas will

9   be biased against [p]laintiffs based on their allegations [of a sham prosecution], and that the

10  government believes it will be advantaged on the merits by transfer."  (*Id.* at 16.)  Plaintiffs also

11  assert that this court has a comparable interest to that held by the Southern District of Texas in

12  "protecting the integrity of the courts" as well as an interest in protecting the rights of its

13  residents.  (*Id.*)

14        In reply, the government argues that the Southern District of Texas has a special interest

15  in protecting the integrity of the courts because it "is deeply familiar with its own procedures and

16  personnel" and "it would be that court's responsibility to take corrective action" if plaintiffs prove

17  that plaintiff A.F.P.'s guilty plea for illegal entry was made without counsel and without the use

18  of an interpreter.  (Doc. No. 21 at 14.)

19        Although the Southern District of Texas certainly does have a local interest in this action,

20  plaintiffs allege misconduct and mistreatment by the federal government, "giving rise to a

21  national interest in the matters to be litigated."  *See Flores*, 142 F. Supp. 3d at 291.  Plaintiffs

22  were apprehended by federal officers, held in federal detention centers, and allege mistreatment

23  by federal officers in violation of federal policies.  It has been recognized that "[i]mmigration,

24  and the treatment of those who have entered the United States without inspection is a matter of

25  national concern."  *Alvarado v. United States*, No. 2:16-cv-05028-SCM, 2017 WL 2303758, at *8

26  (D.N.J. May 25, 2017).  Furthermore, while the Southern District of Texas may have a special

27  interest in the integrity of the procedures and processes employed by that court and implicated by

28  plaintiffs' allegations, the integrity of courts is an interest shared equally by all federal courts,

1    including this one.  When issues are national in scope, courts have held that consideration of the

2    public interests do not warrant a transfer of venue.  *Id.* (citing *Joao Control & Monitoring*

3    *Systems, LLC v. Ford Motor Co.*, No. 1:12-cv-01479-GMS, 2013 WL 4496644, at *3 (D. Del.

4    Aug. 21, 2013)).

5            In addition, this court's overwhelming caseload has been well publicized and the long-

6    standing lack of judicial resources in this district long-ago reached crisis proportion.  That

7    situation has now, however, been partially addressed by the U.S. Senate's confirmation of district

8    judges for two of this court's three vacancies, the first on December 17, 2021 and the second on

9    June 21, 2022.  Nonetheless, for over twenty-two months the undersigned was left presiding over

10   approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation

11   resulted in the court not being able to issue orders in submitted civil matters within an acceptable

12   period of time and continues even now as the undersigned works through the predictable backlog.

13   However, while the congestion in this court is a factor weighing in defendant's favor, this

14   district's backlog is, by itself, not a determinant factor upon which the granting of the motion to

15   transfer should be based, particularly in light of the presence of factors weighing against transfer.

16   *See Trevino v. Golden State FC, LLC*, No. 1:17-cv-01300-DAD-BAM, 2019 WL 6790763, at *6

17   (E.D. Cal. Dec. 12, 2019) (denying transfer where the defendant "offer[ed] no authority for the

18   proposition that court congestion *alone* provides an adequate reason to transfer an action to

19   another district.") (emphasis in original); *but see Parker v. FedEx Nat'l, Inc.*, No. 1:10-cv-01357-

20   LJO-MJS, 2010 WL 5113809, at *1 (E.D. Cal. Dec. 9, 2010), *report and recommendation*

21   *adopted sub nom. Parker v. FedEx Nat'l LTL, Inc.*, No. 1:10-cv-01357-LJO-MJS, 2011 WL

22   13323369 (E.D. Cal. Jan. 18, 2011) (noting that that court transferred the case in part because of

23   this district's heavy caseload).

24           For all of the reasons discussed above, the court concludes that the government has failed

25   to satisfy its burden of demonstrating that a transfer would promote the convenience of parties

26   and witnesses or would be in the interests of justice.  Plaintiffs' limited means would make it

27   difficult, if not impossible, for them to effectively litigate this case in the Southern District of

28   Texas.  The availability of video testimony or depositions in lieu of live testimony and the ease

1   with which documentary evidence can now be transferred eliminates any substantial burden that

2   might be imposed on witnesses and the parties by trying this action in the Eastern District of

3   California.  Accordingly, this court will deny defendant's motion to transfer venue and turn to

4   defendant's motion to dismiss.

5   **B.**    **Motion to Dismiss**

6       The government argues that the court lacks jurisdiction over plaintiffs' claims because

7   "policy choices cannot be challenged in a tort suit under the FTCA."  (Doc. No. 22-1 at 19.)  The

8   government presents five main arguments in moving to dismiss plaintiffs' complaint in its

9   entirety, contending that:  (1) plaintiffs have failed to establish the existence of a private-person

10  analogue as is required by the FTCA;  (2) the due care exception to the FTCA for actions taken

11  while reasonably executing the law applies here;  (3) the discretionary function exception to the

12  FTCA applies here; (4) the FTCA's independent contractor exclusion also applies in this case;

13  and (5)plaintiffs' claims are impermissible direct-liability or systemic-tort claims.  (*Id.* at 20–35.)

14  The court will address each of these arguments in turn.

15       1.    <u>Plaintiffs' Claims Satisfy the Private-Person Analogue Requirement</u>

16       The government argues that plaintiffs have failed to establish a private person analogue as

17  required under the FTCA "[b]ecause only the federal government has the authority to enforce

18  federal criminal and immigration laws and make detention determinations[.]"  (Doc. No. 22-1 at

19  31.)

20       To establish subject matter jurisdiction under the FTCA, plaintiffs must show that "a

21  private individual under like circumstances would be liable under state law."  *United States v.*

22  *Muniz*, 374 U.S. 150, 153 (1963); 28 U.S.C. § 1346(b).  To satisfy this requirement, the claims

23  alleged must demonstrate "a persuasive analogy with private conduct."  *Westbay Steel, Inc. v.*

24  *United States*, 970 F.2d 648, 650 (9th Cir. 1992) (internal quotation and citation omitted).

25  Because "the federal government 'could never be exactly like a private actor,'" the Ninth Circuit

26  requires only that the court "find the most reasonable analogy" to private tortious conduct.

27  *Dugard v. United States*, 835 F.3d 915, 919 (9th Cir. 2016) (*quoting LaBarge v. Mariposa Cnty.*,

28  798 F.2d 364, 367 (9th Cir. 1986)).  A private analogue, however, need only exist under "like

circumstances," not "under the same circumstances."  *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955) (rejecting the argument that 28 U.S.C. § 2674 excludes "liability for negligent performance of 'uniquely governmental functions,'" and noting that "the statutory language is 'under like circumstances,'" not "under the same circumstances").  Courts are to look to "the law of the place where the act or omission occurred" to determine whether a private person analogue for the government's conduct exists.  28 U.S.C. § 1346(b)(1); *see also FDIC v. Craft*, 157 F.3d 697, 706 (9th Cir. 1998).

Here, plaintiffs allege claims of intentional infliction of emotional distress ("IIED"), abuse of process, and negligence.  (Compl. ¶¶ 82–101.)  Texas law applies in this case because the majority of the facts alleged refer to acts that occurred in Texas (*see* Compl. at ¶¶ 24–61.)  A private person may be subject to liability under Texas law for IIED, abuse of process, and negligence in analogous circumstances.  Indeed, one district court applying Texas law has recognized the viability of an IIED claim brought under the FTCA where government employees separated family members.  *See M.D.C.G. v. United States*, No. 7:15-cv-00552, 2016 WL 6638845, at *11–12 (S.D. Tex. Sept. 13, 2016) (allowing an IIED claim to proceed based on alleged trauma where the government separated a mother and daughter for three days, and separated an accompanying minor for a month).  Plaintiffs' complaint in this action contains multiple factual allegations that the government's separation of plaintiffs for fifteen months caused both plaintiffs to suffer emotional trauma.  (*See, e.g.*, Compl. at ¶¶ 1–8.)

Texas law also provides for an abuse of process claim where a private person, as well as a government employee, engages in "the malicious use or misapplication of process in order to accomplish an ulterior purpose."  *Hunt v. Baldwin*, 68 S.W.3d 117, 129 (Tex. App. 2001) (defining abuse of process in an action brought by debtor against creditors, a lawyer, and law firms); *see also Cooper v. Trent*, 551 S.W.3d 325, 333–34 (Tex. App. 2018) (concluding that an abuse of process claim based on allegations of prosecutor's pre-trial misconduct could proceed); *Peerless Oil & Gas Co. v. Teas*, 138 S.W.2d 637, 641 (Tex. Civ. App. 1940) (affirming a jury verdict for abuse of process based on the malicious issuance of a writ of garnishment).  Here, plaintiffs have alleged that defendant maliciously used plaintiff A.F.P's prosecution for illegal

17

1   entry as a pretext for separating him from his minor son in pursuit of an ulterior purpose of

2   deterring other asylum seekers from entering the United States.  (Compl.  ¶¶ 1–2, 29–37.)

3         Finally, Texas courts have previously held that a negligence claim may be pursued against

4   private individuals tasked with the custody of others.  *See Salazar v. Collins*, 255 S.W.3d 191,

5   198 (Tex. App. 2008).  Under Texas law, "a private facility for the mentally impaired which was

6   required by State contract to exercise supervisory control of its residents could have a duty to

7   exercise control over its residents" to ensure their safety.  *Id.* (citing *Texas Home Mgmt., Inc. v.*

8   *Peavy*, 89 S.W.3d 30, 39 (Tex. 2002)).  In *Salazar*, the court applied that test to the Texas

9   Department of Criminal Justice, finding that "its officials and employees who exercise

10   supervisory authority in its prisons have a 'special relationship' with TDCJ inmates and thus owe

11   a duty of reasonable care to protect inmates from harm when that harm is reasonably

12   foreseeable."  *Id.* at 203.  Federal immigration officials, like employees at a private facility for the

13   mentally impaired tasked with the care and custody of facility residents, also have a "special

14   relationship" with detainees in that they "are tasked with the care and custody of those they

15   detain, and owe detainees at least a minimal level of care."  *C.M. v. United State*s, No. 2:19-cv-

16   05217-PHX-SRB, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020), *motion to certify appeal*

17   *denied*, No. 2:19-cv-19-05217-PHX-SRB, 2020 WL 5232560 (D. Ariz. July 6, 2020) (finding that

18   a private analogue existed for a negligence claim brought under the FTCA against immigration

19   officials for the forced separation of parents and their minor children who entered the United

20   States to seek asylum).

21         Therefore the court concludes that plaintiffs have demonstrated a private analogue for

22   each of their claims under Texas law in like circumstances.  The court therefore also finds that it

23   has subject matter jurisdiction over this action in the absence of defendant establishing that an

24   exception or exclusion to the FTCA applies in this case.

25         2.    <u>Plaintiff A.F.P.'s Claims Are Not Barred by the Discretionary Function Exception</u>

26         The government next argues that the discretionary function exception bars claims arising

27   out of the government's decisions to prosecute plaintiff A.F.P., to detain A.F.P. in detention

28   /////

1   facilities pending his removal, to remove A.F.P., and by permitting the conditions of his

2   confinement while detained.  (Doc. No. 22-1 at 22–16.)

3         "As a sovereign, the United States is immune from suit unless it waives such immunity."

4   *Chadd v. United States*, 794 F.3d 1104, 1108 (9th Cir. 2015) (citing *FDIC v. Meyer*, 510 U.S.

5   471, 475 (1994)).  The waiver of sovereign immunity is a prerequisite to federal court

6   jurisdiction.  *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011); *see also United States*

7   *v. Mitchell*, 445 U.S. 535, 538 (1980).  The FTCA waives the government's sovereign immunity

8   for tort claims arising out of negligent conduct of government employees acting within the scope

9   of their employment.  *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008); *see also*

10  *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  Pursuant to the FTCA, the United States

11  can thus be sued "under circumstances where the United States, if a private person, would be

12  liable to the claimant in accordance with the law of the place where the act or omission occurred."

13  28 U.S.C. § 1346(b)(1); *Chadd*, 494 F.3d at 1109.

14        The FTCA, however, provides various exceptions to this broad waiver of sovereign

15  immunity.  One such carve-out is the discretionary function exception, which provides immunity

16  from suit for "[a]ny claim based upon the exercise or performance or the failure to exercise or

17  perform a discretionary function or duty on the part of a federal agency or an employee of the

18  Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  This

19  exception is designed to "prevent judicial 'second-guessing' of legislative and administrative

20  decisions grounded in social, economic, and political policy through the medium of an action in

21  tort."  *Chadd*, 794 F.3d at 1108 (citing *United States v. S.A. Empresa de Viacao Aerea Rio*

22  *Grandense* (*Varig Airlines*), 467 U.S. 797 (1984)).  "The government bears the burden of proving

23  that the discretionary function exception applies."  *Myers v. United States*, 652 F.3d 1021, 1028

24  (9th Cir. 2011).

25        In *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988), the Supreme Court

26  established a two-step test for determining the applicability of the discretionary function

27  exception.  Under that test, this court must first consider whether the challenged conduct is

28  "discretionary in nature," that is, whether the actions "involve an 'element of judgment or

19

1  choice.'" *Terbush*, 516 F.3d at 1129 (quoting *United States v. Gaubert*, 499 U.S. 315, 327

2  (1991)); *see also Berkovitz*, 486 U.S. at 536 (noting that the focus is on the nature of the conduct

3  rather than the status of the actor).  The discretionary function exception will not apply if "a

4  federal statute, regulation, or policy specifically prescribes a course of action for an employee to

5  follow," because "there can be no element of discretion when an employee has no rightful option

6  but to adhere to the directive." *Terbush*, 516 F.3d at 1129; *see also Berkovitz*, 486 U.S. at 536.  If

7  the *Berkovitz* test is satisfied at step one, the analysis proceeds to the second step, at which the

8  court must determine whether the discretion left to the government "is of the kind that the

9  discretionary function exception was designed to shield," that is, discretion rooted in

10 "considerations of public policy." *Bailey v. United States*, 623 F.3d 855, 860 (9th Cir. 2010); *see*

11 *also Myers*, 652 F.3d at 1028.  Ultimately, if the challenged act or omission satisfies the two steps

12 of the *Berkovitz* test, the government is immune from suit based on that act or omission, and

13 federal courts lack subject matter jurisdiction over the action.  *Bailey*, 623 F.3d at 860.  This

14 immunity exists even if the act or omission in question constituted an abuse of discretion or was

15 the wrong choice under the circumstances.  *See* 28 U.S.C. § 2680(a); *Terbush*, 516 3d. at 1129

16 ("Even if the decision is an abuse of the discretion granted, the exception will apply.")

17        However, the discretionary function exception does not shield the government from

18 liability for unconstitutional conduct.  *Nurse v. United States*, 226 F.3d 996, 1002 n.3 (9th Cir.

19 2000) (reversing the dismissal of FTCA claims pursuant to the discretionary function exception

20 where the plaintiff alleged a constitutional violation); *Loumiet v. United States*, 828 F.3d 935, 943

21 (D.C. Cir. 2016) (holding that "the FTCA's discretionary-function exception does not provide a

22 blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a

23 constitutional prescription," discussing cases from the First, Second, Third, Fourth, Fifth, Eighth,

24 and Ninth circuits which held the same); *see also A.P.F. v. United States*, 492 F. Supp. 3d 989,

25 996 (D. Ariz. 2020) (holding that the discretionary function exception does not apply where

26 plaintiffs in circumstances similar to those alleged here asserted constitutional violations related

27 to their forced family separation); *Plasencia v. United States*, No. 5:17-cv-02515-JGB-SP, 2018

28 WL 6133713, at *9 (C.D. Cal. May 25, 2018) (holding that the discretionary function exception

1    does not apply where the plaintiffs allege injuries resulting from unconstitutional conduct in

2    connection with immigration-related detention).

3           Here, plaintiffs have plausibly alleged that the government's separation of a father and son

4    for fifteen months violated their constitutional rights.  The complaint in this case alleges the facts

5    of plaintiffs' forced separation, the conduct of the government in carrying out that separation, and

6    specifically asserts that such conduct was in violation to plaintiffs' constitutional rights to family

7    integrity.  (Compl. ¶¶ 1–6, 8, 27, 34–46, 56–73, 79, 80.)  The "substantive due process right to

8    family integrity . . . is well established."  *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th

9    Cir. 2011).  In determining whether a substantive due process right applies to particular executive

10   action, "the threshold question is whether the behavior of the governmental officer is so

11   egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

12   *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

13          As plaintiffs note in their opposition to the pending motion, courts that have considered

14   the constitutionality of the government's practice of family separation at the border have found

15   the practice to likely be unconstitutional.  *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F.

16   Supp. 3d 1133, 1144–46 (S.D. Cal. 2018) (finding the government's practice of separating

17   families, and the procedures used to implement this practice, "likely to be so egregious, so

18   outrageous, that it may fairly be said to shock the contemporary conscience, interferes with rights

19   implicit in the concept of ordered liberty[,] and is so brutal and offensive that it [does] not

20   comport with traditional ideas of fair play and decency") (internal quotation marks and citations

21   omitted); *Jacinto-Castanon de Nolascov v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491,

22   499 (D.D.C. 2018) (a family involuntarily separated after crossing the border "likely w[ould]

23   succeed on their substantive due process claim premised on their constitutional right to family

24   integrity"); *J.S.R. by and through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 741 (D. Conn. 2018)

25   (even the government "agree[d] that a constitutional violation occurred when the government

26   separated children from their parents").

27          In considering whether the discretionary function exception applies to suits arising from

28   the family-separation policy, courts have held that because the policy is likely unconstitutional

and "government officials lack discretion to violate the Constitution, the discretionary function exception cannot shield conduct related to the government's likely unconstitutional separation of plaintiffs." *A.P.F.*, 492 F. Supp. 3d at 996 (internal citation omitted); s*ee also Plascencia*, 2018 WL 6133713 at *9 (the discretionary function exception does not apply when plaintiffs allege injuries resulting from unconstitutional conduct in immigration-related detention); *C.M.*, 2020 WL 1698191, at *4 (finding that plaintiffs had "plausibly alleged that the government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception"); *Nuñez Euceda v. United States*, No. 2:20-cv-10793-VAP-GJSx, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021) (holding that "the discretionary function [exception] does not bar [p]laintiff's claims" because plaintiff "has plausibly alleged that the government's [family separation] Policy violated his constitutional rights").

Here, the government argues that the discretionary function exception "is not defeated by a mere declaration that plaintiffs suffered harm as a result of some unspecified violation of their 'constitutional and statutory rights.'" (Doc. No. 22-1 at 29.)  However, plaintiffs' complaint specifically alleges that the government's conduct violated plaintiffs' rights to family integrity and details numerous factual allegations in support of that claim.  (*See* Compl. ¶¶ 74–80.) Because the discretionary function exception does not shield the government from liability for unconstitutional conduct, the court need not reach step two of the *Berkovitz* test here.  *See Nurse*, 226 F.3d at 1002 n.3.  Because plaintiffs have plausibly alleged a violation of their substantive due process right to family integrity and because "each of plaintiffs' causes of action stem from that separation, none of their claims are barred by the discretionary function exception."  *A.P.F.*, 492 F. Supp. 3d at 996.

The court likewise rejects the government's argument that the discretionary function exception applies because plaintiffs cannot show their constitutional right to family integrity was clearly established at the time of their separation.  (Doc. No. 22-1 at 27–29.)  The government appears to invite the court to expand the discretionary function exception test to incorporate the doctrine of qualified immunity and limit FTCA jurisdiction to only those claims that are based upon alleged violations of a "specific, clearly established directive[.]"  (*Id.* at 28.)  The

1    government has cited no caselaw that supports their argument for such an expansion of the

2    exception, and the qualified immunity decisions they cite do not pertain to FTCA claims.  (*Id.* at

3    27–29.)  The government also cites to two decisions in which the Ninth Circuit held that dismissal

4    of actions at the pleading stage was in error because it could not be determined on the complaint

5    alone whether a constitutional violation had occurred, and therefore whether the discretionary

6    function exception applied.  (*Id.* (citing *Fazaga v. F.B.I.*, 965 F.3d 1015, 1065 (9th Cir. 2020);

7    *Nurse*, 226 F.3d at 1002).)  However, the Ninth Circuit in *Nurse* declined to address "the level of

8    specificity with which a constitutional proscription must be articulated in order to remove the

9    discretion of a federal actor" and did not address the issue at all in *Fazaga*.  *Nurse*, 226 F.3d at

10   1002 n.2.  The discretionary function exception is a carve out to the broad waiver of sovereign

11   immunity under the FTCA.  *See Terbush*, 516 F.3d at 1128.  In light of defendant's failure to

12   present any authority for its proposition the court should expand the discretionary function

13   exception to require that FTCA claims must clearly establish the constitutional right in order to

14   evade the exception, the court declines to do so.

15          The court also rejects the government's characterization of plaintiffs' factual allegations

16   as standalone claims.  (Doc. No. 22-1 at 22–27.)  The court recognizes that the government may

17   assert a factual attack in this jurisdictional challenge and may also introduce evidence outside the

18   pleadings in moving to dismiss on jurisdictional grounds.  *Leite*, 749 F.3d at 1121.  However, the

19   factual allegations that the government challenges with their additional evidence concern not the

20   existence of jurisdiction, but the alleged harm resulting from the separation of plaintiffs.

21   Allegations related to the government's decisions to refer plaintiff A.F.P. for criminal

22   prosecution, to A.F.P's removal, and to the "conditions of confinement (including the degree of

23   permitted communication), treatment of [p]laintiff [J.F.C.] during and after the separations"

24   including during his detention at Children's Village, "are factual allegations primarily aimed at

25   demonstrating the harm resulting from the separations."  *A.P.F.*, 492 F. Supp. at 996–97; (*see*

26   Doc. No. 22-1 at 22–27 (arguing that each such allegation is a stand-alone claim subject to the

27   discretionary function exception)).  To the extent that the government invites the court to engage

28   in analyzing the truth of each alleged fact and evaluating which fact could or could not prove a

1    claim, the court declines to do so.  *See C.M.*, 2020 WL 1698191, at *4 (rejecting similar

2    argument); *A.P.F.*, 492 F. Supp. at 996–97 (same).  Discussion of the extent to which certain facts

3    could or could not prove a claim is outside the scope of this order, and any such analysis would

4    be premature at this stage of the litigation.

5           In short, the court concludes that the government has not established that the discretionary

6    function exception applies in this case.

7           3.      The Due Care Exception Does Not Bar Plaintiffs' Claims

8           The government next argues that the due care exception to the FTCA bars plaintiffs'

9    claims because, the government contends, it was required by statute to detain noncitizens subject

10   to removal orders and to transfer custody of children to ORR within 72 hours of "determining that

11   there is no parent available to provide care and physical custody" of the minor child.  (Doc. No.

12   22-1 at 29–30) (citing 8 U.S.C. §§ 1232(b)(3), 1231(a)(2).)

13          Courts in the Ninth Circuit apply the two-prong test established by the decision in *Welch*

14   *v. United States*, 409 F.3d 646, 652 (4th Cir. 2005) in determining whether the due care exception

15   applies.  *See Ferguson v. United States*, No. 3:15-cv-01253-JM-MDD, 2016 WL 4793180, at *7

16   (S.D. Cal. Sept. 14, 2016) (applying *Welch*'s two-part test);  *Kwai Fun Wong v. Beebe*, No. 3:01-

17   cv-00718-BR, 2006 WL 977746, at *7–8 (D. Or. Apr. 10, 2006) (same); *C.M.*, 2020 WL

18   1698191, at *3 (same).  Under the decision in *Welch*, the due care exception applies only if (1)

19   the statute or regulation in question "specifically pr[e]scribes a course of action for an officer to

20   follow," and (2) "the officer exercised due care in following the dictates of that statute or

21   regulation." *Welch*, 409 F.3d at 652 (citing *Crumpton v. Stone*, 59 F.3d 1400, 1403 (D.C. Cir.

22   1995)).  Otherwise stated, the due care exception applies only when an official was "reasonably

23   executing the mandates of" a statute or regulation.  *Id.* at 651.

24          In moving to dismiss, the government argues that the due care exception applies when the

25   conduct at issue is "authorized by statute or regulation."  (Doc. No. 22-1 at 29–30 (citing *Borquez*

26   *v. United States*, 773 F.2d 1050, 1052–53 (9th Cir. 1985)).  It asserts that the government is

27   required by 8 U.S.C. § 1231(a)(2) to detain noncitizens subject to removal orders, like plaintiff

28   A.F.P.  (*Id.*)  The government contends that the separation of plaintiffs was required by 8 U.S.C.

1   § 1232(b)(3), which provides that unaccompanied immigrant children are to be transferred from

2   DHS custody to ORR custody within "72 hours [of] determining that such child is an

3   unaccompanied alien child." (Doc. No. 22-1 at 30.) It thus argues that plaintiff J.F.C. was

4   required to be transferred to ORR custody after "the government made the determination that

5   AFP was unable to provide care and physical custody for JFC because it had previously made the

6   discretionary decisions to refer AFP for criminal prosecution and to detain him in a secure

7   immigration detention facility." (*Id.*) In a footnote, the government addresses several opinions in

8   which district courts have concluded that no statute or regulation mandates the separation of those

9   like plaintiffs here upon their entry at the border. (*Id.* at fn. 10.) The government distinguishes

10  those cases by contending that that 8 U.S.C. § 1232(b)(3) requires such separation when the

11  parents are referred for criminal prosecution, as A.F.P. was in the instant case. (*Id.*)

12          Plaintiffs argue in opposition that the government is relying on the wrong test to

13  determine if the due care exception applies and is neglecting the second prong of the *Welch* test

14  altogether. (Doc. No. 24 at 23.) Plaintiffs contend that no statute or provision "expressly

15  authorized the government to separate [p]laintiffs in the circumstances alleged[,]" noting that 8

16  U.S.C. § 1232(b)(3) does not authorize "the forcible, prolonged family separation" upon

17  plaintiffs' entry into the United States. (*Id.* at 24 (citing cases where courts have found no statute

18  or regulation authorizing family separation in circumstances similar to those alleged here).)

19  Plaintiffs additionally argue that defendant cannot satisfy the second prong of the *Welch* test—

20  actual due care taken—because the manner in which plaintiffs were separated, the denial of

21  information about and contact between father and son, and their prolonged separation sufficiently

22  demonstrate that defendant failed to "exhibit even a 'minimal concern'" for plaintiffs. (*Id.* at 25.)

23          In reply, defendant repeats its assertion that the 8 U.S.C. § 1232(b)(3) required that

24  plaintiff J.F.C. be transferred to ORR custody because the government determined his father was

25  unable to provide care due to the government's decision to criminally prosecute plaintiff A.F.P.

26  and detain him. (Doc. No. 25 at 18.) Defendant advances no argument with respect to whether

27  due care was actually taken in the execution of the separation of plaintiffs.

28  /////

As noted above, courts in the Ninth Circuit apply the due care exception only when a statute or regulation "specifically pr[e]scribes a course of action." *Welch*, 409 F.3d at 652. Contrary to the position taken by the government here, the conduct must be *required*, not merely authorized, by a statute or regulation. *See id.* The court agrees with the other district courts in this circuit that have concluded, when faced with the same argument advanced by defendant here, that the government has failed to cite to any "statute or regulation mandating the separation of [p]laintiffs upon their entry into the country" under the circumstances alleged in the complaint in this case. *See A.P.F.*, 492 F. Supp. 3d at 996; *C.M.*, 2020 WL 1698191, at *3; *Nunez Euceda v. United States*, No. 2:20-cv-10793-VAP-GJSx, 2021 WL 4895748, *4 (C.D. Cal. Apr. 27, 2021). Defendant have cited no statute or regulation that required the detention of plaintiff A.F.P. in a different detention facility from plaintiff J.F.C. *See A.P.F.*, 492 F. Supp. 3d at 996; *C.M.*, 2020 WL 1698191, at *3; *Nunez Euceda*, 2021 WL 4895748 at *4. Furthermore, "family separation was established by executive policy—not by a statute or regulation—which is not covered by the due care exception." *A.P.F.*, 492 F. Supp. 3d at 996. Finally, none of the statutory provisions cited by the government mandate enforcement of the policy.

Furthermore, even if a statute or regulation did mandate separation of the plaintiffs, the government has not shown—indeed, it has made no argument at all—that due care was actually taken as required under the second prong of the *Welch* test. *Welch*, 409 F.3d at 652 (the due care exception applies only when "the officer exercised due care in following the dictates of that statute or regulation"). Plaintiffs here have alleged that government employees and officials separated plaintiffs when plaintiff A.F.P. was occupied for only a few hours with a federal court hearing, that plaintiff A.F.P. was denied information about where plaintiff J.F.C. was transferred to, that the plaintiffs were denied contact with each other, that government employees used the separation to coerce A.F.P. into forfeiting his right to stay the removal proceedings, and that plaintiffs were separated for fifteen months. (Compl. ¶¶ 26–28, 35–36, 42, 46–52.) These factual allegations do not support a finding that due care was actually taken, as required for the due care exception to apply. *See Welch*, 409 F.3d at 652.

/////

26

In short, the government has failed to satisfy its burden of showing that the due care exception applies in this case.

### 4.  The Independent Contractor Exclusion to the FTCA Does Not Apply

The government also argues that plaintiffs' fourth claim for negligence based on the alleged abuse of plaintiff J.F.C. while in the custody of ORR is barred by the independent contractor exclusion to the FTCA because the alleged mistreatment was carried out by staff at the independent contractor facility Children's Village Shelter.  (Doc. No. 22-1 at 33–34.)

The FTCA waives sovereign immunity for tortious conduct performed by "an employee of the Government" and provides an express exclusion for acts performed by independent contractors.  *United States v. Orleans*, 425 U.S. 807, 813 (1976); 28 U.S.C. § 2671 ("As used [in the FTCA] the term 'Federal agency' . . . does not include any contractor with the United States").  "Courts have construed the independent contractor exception to protect the United States from vicarious liability for the negligent acts of its independent contractors."  *See Edison v. United States*, 822 F.3d 510, 518 (9th Cir. 2016).

Defendant argues that plaintiffs' negligence claim is "untenable" because it rests solely on a theory of vicarious liability for actions performed by Children's Village and the FTCA excludes liability for acts of independent contractors.  (*Id.* at 35.)  According to the declaration of James De La Cruz, a former Senior Federal Field Specialist Supervisor for ORR, plaintiff J.F.C. was not held in a detention center after he was transferred in custody to ORR, but was held at a facility operated by independent contractor Children's Village Shelter. (Doc. No. 22-2, Exh. D, De La Cruz Decl. ¶ 4.)  The government contends that because ORR "does not exercise substantial supervision and control over the day-to day operations or detailed physical performance of contractors like Children's Village but only conducts general oversight," the FTCA does not reach Children's Village and plaintiffs cannot state a cognizable claim based on the alleged mistreatment suffered by plaintiff J.F.C. while in its custody.  (*Id.* at 34. (internal citations omitted).)

Plaintiffs do not dispute that custody of plaintiff J.F.C. was transferred from ORR to Children's Village.  (Doc. No. 24 at 31.)  Instead, plaintiffs argue that defendant's separation of

1   plaintiffs pursuant to its family separation policy was a proximate cause of plaintiff J.F.C.'s

2   injuries while in the care of ORR contractors because "J.F.C. would not have been in ORR

3   custody, and so would not have suffered any physical injury, absent [d]efendant's tortious

4   conduct of separating [p]laintiffs in the first place."  (*Id.*)  Plaintiffs also contend that defendant's

5   argument as to the application of the independent contractor exclusion was previously rejected by

6   the district court in *A.P.F. v. United States*, 492 F. Supp. 3d at 997–98.

7          In reply, defendant argues that plaintiffs' reliance on *A.P.F.* is misplaced because in that

8   case, the alleged harms "were proximately caused by alleged wrongdoing of government

9   employees and not based on vicarious liability for alleged negligence of contractors."  (Doc. No.

10  25 at 20 (citing *A.P.F.*, 492 F. Supp. 3d at 998).)  The government contends that in contrast to

11  claim presented in *A.P.F.*, plaintiffs' fourth claim for negligence brought in this action is

12  "expressly based on vicarious liability" for plaintiff's J.F.C.'s alleged mistreatment while in

13  custody of Children's Village.  (*Id.*)

14         In *A.P.F.*, the plaintiffs sought damages for abuse suffered while detained in a facility

15  operated by government contractors.  492 F. Supp. 3d at 998.  The district court in *A.P.F.*

16  distinguished the plaintiffs' claims brought in that case from one resting on vicarious liability,

17  explaining as follows:

18          The Amended Complaint alleges that three Plaintiff Children
19          suffered abuse while held in federal custody at facilities operated by
            contractors.  (FAC ¶ 16.)  The Amended Complaint traces this harm
20          back to CBP officials' separation of Plaintiff families.  (FAC ¶¶ 15,
            534, 547.)  These separations were carried out by government
21          employees pursuant to executive policy.  (FAC ¶¶ 45, 59–79.)  Had
            the families remained intact, no foster-case abuse would have
22          occurred. (See FAC ¶¶ 534, 547.)

23                                    * * *

24          *Walding*, on which the United States principally relies, involves
            circumstances and claims materially distinct from those alleged here.
25          While this case overlaps with *Walding* to the extent Plaintiffs seek
            damages for the abuse suffered while in custody of the Office of
26          Refugee Resettlement and detained in a facility operated by
            government contractors, the similarity ends there.  955 F. Supp. 2d
27          at 762.  *Walding* plaintiffs sued under the theories that the
            government (1) negligently selected and supervised the contractors
28          running the detention facility, and (2) was vicariously liable for the
            contractors' negligence. *Id.* at 763.  Here, in contrast, Plaintiffs seek

1
2
3
4

> recovery for harm caused by the government's policy and practice of separating families. *Walding* plaintiffs' harm was untraceable to an overarching executive policy and thus more attenuated to governmental conduct than Plaintiffs' harm, which Plaintiffs allege was proximately caused by the federal government's family-separation policy. (FAC ¶¶ 534, 547.)

5   *A.P.F.*, 492 F. Supp. 3d at 997–98.

6   The court disagrees with the government's framing of plaintiffs' fourth claim for

7   negligence brought in this action as expressly and solely relying on a theory of vicarious liability.

8   Instead, the undersigned finds *A.P.F.* to be instructive here. *See* 492 F. Supp. 3d at 988. Here, as

9   in *A.P.F.*, plaintiffs seek damages for the physical and emotional harm plaintiff J.F.C. suffered

10  while detained at Children's Village, which was operated by government contractors and not

11  directly by the government. (*See* Compl. at ¶¶ 62–73, 77–78.) Plaintiffs' fourth claim alleges in

12  part that "[d]efendant's employees had a duty to [p]laintiff to act with ordinary care and prudence

13  so as not to cause harm or injury to [p]laintiff J.F.C. while he was in [d]efendant's custody."

14  (Compl. ¶ 98.) This language could be interpreted to seek vicarious liability based directly on the

15  harm inflicted on plaintiff J.F.C. by Children's Village employees. To the extent plaintiffs seek

16  recovery from the government on a theory of vicarious liability for actions or lack of action taken

17  by staff at Children's Village, such recovery is barred by the independent contractor exception to

18  the FTCA. *See Walding v. United States*, 955 F. Supp. 2d 759, 762 (W.D. Tex. 2013). However,

19  the plaintiffs do not, as the government contends, base their fourth claim for negligence solely on

20  a theory of vicarious liability. Plaintiffs' fourth claim for relief also incorporated by reference all

21  of plaintiffs' preceding allegations (Compl. ¶ 97) and also specifically alleges that plaintiff J.F.C.

22  suffered substantial damages as "a direct and proximate result of the conduct described in this

23  Complaint." (Compl. ¶¶ 98, 100.) The very first paragraph of the Complaint, incorporated by

24  reference into plaintiffs' negligence claim, alleges that "[t]he government's policy of forcibly

25  taking children from their parents caused extraordinary trauma to thousands of families, including

26  Plaintiffs A.F.P. and his son J.F.C., whom the United States government forcibly separated for

27  fifteen months." (Compl. at ¶ 1.) Like the plaintiffs in *A.P.F.* who alleged that "their harm was

28  proximately caused by the federal government's family-separation policy," plaintiffs here also

1    trace the harm they suffered to their forced separation pursuant to the government's policy.

2    (Compl. ¶¶ 68–70, 74, 77–81; Doc. No. 24 at 31 (contending that "J.F.C. would not have been in

3    ORR custody, and so would not have suffered any physical injury, absent [d]efendant's tortious

4    conduct of separating [p]laintiffs in the first place.").)

5          Therefore, to the extent plaintiffs' fourth claim of negligence is based on vicarious

6    liability for the conduct of the Children's Village staff, that claim is barred by the independent

7    contractor exclusion.  However, the negligence claim may proceed based on plaintiffs' allegations

8    that the government's conduct of forcibly separating plaintiffs was a direct and proximate cause

9    of the harm suffered by plaintiff J.F.C. while in New York.

10          5.    There Is No Legal Basis to Bar Plaintiffs' Claims as Systemic Torts

11          Finally, the government advances its argument that plaintiffs' claims are "systemic"

12   claims that impermissibly "seek to raise direct liability and institutional tort claims against the

13   United States."  (Doc. No. 22-1 at 32.)  Citing the decision in *Lee v. United States*, No. 3:19-cv-

14   08051-DLR-DMF, 2020 WL 6573258, at *6 (D. Ariz. Sept. 18, 2020), the government argues

15   that this action must be dismissed because plaintiffs assert only "generalized" claims against

16   federal institutions as a whole.  (*Id.*)  Defendant contends that plaintiff's claims are improper

17   because they describe plaintiffs' harm as caused by the "United States Government, rather than

18   specific tortious conduct on the part of specific federal employees for whom the United States

19   must assume liability."  (*Id.* (citing Compl. ¶¶ 1, 2, 6, 8, 10).)

20          Plaintiffs point out that the FTCA requires them to "sue[] the United States itself."  (Doc.

21   No. 24 at 30–31 (quoting *García-Feliciano v. United States*, No. 3:12-cv-01959-SCC, 2014 WL

22   1653143, at *3 (D.P.R. Apr. 23, 2014).)  Plaintiffs assert that the district court in *Lee* dismissed a

23   claim as "too vague and conclusory" because it failed to "set forth the alleged acts or omissions of

24   specific federal employees."  (Doc. No. 24 at 30 (citing *Lee*, 2020 WL 6573258, at *5).)

25   Plaintiffs distinguish the claims they have brought in this action by pointing out that their

26   complaint does allege specific courses of conduct performed by individual federal employees.

27   /////

28   /////

1    In response, the government argues only that "plaintiffs' allegations are too vague and

2    conclusory to impose liability []under the FTCA for the actions of any individual federal

3    employees."  (Doc. No. 25 at 19 (internal citations omitted).)

4    The government has not provided a sound legal basis for its argument which the court

5    finds to be unpersuasive.  References to the "United States Government" as a whole are not

6    unexpected in a FTCA action, which may only be brought against "the United States itself."

7    *García-Feliciano*, 2014 WL 1653143, at *3.  The government has cited only two cases in support

8    of its argument in this regard, neither of which appear to be relevant.  The government's reliance

9    on the decision in *Adams v. United States*, 420 F.3d 1049 (9th Cir. 2005) is misplaced.  In *Adams*,

10   the Ninth Circuit held that institutions cannot be employees of the government for the purposes of

11   the FTCA.  (*Id.* at 1052–55.)  That is not at issue here, where plaintiffs have alleged claims only

12   against the government and employees of the government.  (*See generally,* Compl.)  Unlike the

13   complaint addressed by the court in *Lee*, plaintiffs' complaint here sets forth specific alleged acts

14   and omissions of specific federal employees.   *See Lee*, 2020 WL 6573258, at *5.  Plaintiffs'

15   complaint also attributes specific actions, including designing the family separation policy,

16   subjecting plaintiffs to separation, and inflicting cruel conditions of confinement, to certain CBP

17   and ICE employees, as well as other individual federal officials, employees, and contractors.

18   (*See, e.g.*, Compl. ¶¶ 1–6, 24–46, 47–52, 59–73.)  To the extent the government is arguing that

19   plaintiffs must specifically identify every employee, official, and contractor involved in each of

20   the alleged acts, such is not required at this early stage of litigation when discovery has yet to be

21   conducted.

22   For the reasons explained above, the court concludes that plaintiffs' claims are not barred

23   as "systemic torts."

## LEAVE TO AMEND

25   In their opposition brief, plaintiffs seek leave to amend the complaint to cure any

26   deficiencies the court identifies were the court to grant any aspect of defendant's motion to

27   dismiss.  A district court should provide leave to amend upon granting a motion to dismiss unless

28   it is clear that the complaint could not be saved by any amendment.  *See Mueller v. Auker*, 700

1   F.3d 1180, 1191 (9th Cir. 2012) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

2   1025, 1031 (9th Cir. 2008)).  "Valid reasons for denying leave to amend include undue delay, bad

3   faith, prejudice, and futility."  *California Architectural Bldg. Prod. v. Franciscan Ceramics*, 818

4   F.2d 1466, 1472 (9th Cir. 1987); *see also Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d

5   1136, 1144 (9th Cir. 2015) (leave to amend is properly denied if the proposed amendment lacks

6   merit or would be futile in saving plaintiff's suit); *Klamath–Lake Pharm. Ass'n v. Klamath Med.*

7   *Serv. Bureau*, 701 F.2d 1276, 1293 (9th Cir. 1983) (holding that while leave to amend shall be

8   freely given, the court does not have to allow futile amendments).

9          In this order, the court has dismissed only plaintiffs' fourth claim for negligence to the

10   extent that it is based on a theory of vicarious liability.  The court has carefully considered

11   whether plaintiffs are capable of amending this claim of their complaint to state a cognizable

12   claim for relief.  Applying the applicable standards, the court concludes here that granting leave

13   to amend would be futile.  Any such vicarious liability claim would continue to run afoul of the

14   FTCA's independent contractor exclusion.  Therefore, plaintiff will be denied leave to amend

15   their fourth claim for negligence to the extent that it is based on a vicarious liability theory.

16                                           **CONCLUSION**

17          For all of the reasons explained above:

18   1.      Defendant's motion to transfer venue (Doc. No. 15) is denied;

19   2.      The court denies in part and grants in part defendant's motion to dismiss (Doc. No.

20           22) as follows:

21           a.      To the extent plaintiffs' fourth cause of action for negligence is based on a

22                   vicarious liability theory, that claim is barred by the independent contractor

23                   exclusion to the FTCA and is dismissed without leave to amend;

24           b.      Defendant's motion to dismiss is otherwise denied.

25   IT IS SO ORDERED.

26      Dated:   **July 11, 2022**                            *Dale A. Drozd*

27                                              UNITED STATES DISTRICT JUDGE

28